## BUSCH *v.* JONES.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 96. Argued January 14, 1902.—Decided March 17, 1902.

The appellees' contention as to jurisdiction in this case is not justified for reasons expressed in *Clark* v. *Wooster*, 119 U. S. 322, and *Beedle* v. *Bennett*, 122 U. S. 71.

This was an action to recover for infringements of a patent. The lower courts found as a fact that all the claims of the patent had been infringed by appellant, and the evidence sustains the finding. The accounting in the lower court, however, was had upon the basis of the validity of the process, and therefore the judgment of the Court of Appeals must be reversed and the cause remanded with directions to that court to reverse the judgment and decree of the Supreme Court, and remand the cause to the latter court for further proceedings in accordance with this opinion.

This suit was brought by appellees against appellant for the infringement of letters patent No. 204,741, and letters patent No. 452,898, issued to Joshua W. Jones, one of the appellees. An accounting was prayed, and also an injunction, pending the suit. The bill contained the usual allegations of invention and utility, and of infringement by the defendant (appellant). The

answer traversed those allegations, and alleged prior use, disclosure of the invention in prior publications, and also anticipation by prior devices and processes. The answer contained a list of the devices. No evidence was given as to, and no judgment passed on, patent No. 452,898. This appeal, therefore, is only concerned with patent No. 204,741. The patent was issued to Joshua W. Jones, one of the appellees, for a press and process (the relation of the two is disputed) for "dry pressing" and removing type indentations from printed sheets. The validity of the patent was sustained, and its infringement by the defendant (appellant) was found by the Supreme Court of the District of Columbia, and decree passed adjudging appellees the sum of $3491.70 with interest and costs. The decree was affirmed by the Court of Appeals. 16 D. C. App. 23. The case was then brought here. The facts are stated in the opinion.

*Mr. George J. Murray* for appellant.

*Mr. M. W. Jacobs* for appellees.

Mr. Justice McKenna delivered the opinion of the court.

1. A question of jurisdiction is raised. It is contended by appellant that the case was not one of equitable cognizance, the appellees' remedy being, it is claimed, at law. The specification of error upon which the contention is based is expressed as follows:

"Because at the time of the hearing it appeared from the record that the only patent before the court had expired before the hearing, no motion for preliminary injunction having been made prior to the expiration of the patent, and defendant being a mere user of one machine, which machine was destroyed by fire before the case was brought to hearing."

This seeks to determine the jurisdiction of the court by conditions which came into existence after the commencement of the suit, not upon those which existed at the time the bill was filed. It is, however, urged in argument that the contract between Jones and the W. O. Hickok Manufacturing Company

conveyed the patent rights to the press only, and not the process described in the fifth claim of the patent, and that " the court, sitting as a court of equity, had no jurisdiction to order an injunction at the time the bill of complaint was filed." But what the contract provided was an issue to be made in the case, and pending its decision the preliminary relief by injunction could have been granted. Appellees' contention as to the jurisdiction is, therefore, not justified, and a discussion of the reasons for this conclusion is not necessary. They are expressed in *Clark* v. *Wooster*, 119 U. S. 322, and *Beedle* v. *Bennett*, 122 U. S. 71.

2. The patent is designated an " Improvement in Bookbinder's Dry-press and Sheet-tie." That is, a new press and process for removing type indentations from printed papers or sheets, the latter when folded being designated technically as " signatures."

The type indentations are made in printing, the type displacing somewhat the fiber of the paper, and the removal of the indentations is technically known in the art as " dry pressing," and the device by which it is done is called a " dry press." Such a press the patent is intended to cover, and also a particular process for dry pressing. As a process the validity of the patent is questioned, as a new machine its invention is controverted. An inquiry into the prior art becomes therefore important, and a witness, describing it and its imperfections, testified as follows :

" Previous to the invention of Mr. Jones as described in said patent, it was the custom to press printed sheets by inserting them between heavy paper boards, sometimes called ' fuller-boards,' but generally now called ' glazed boards,' and putting said boards with the printed papers between them into a powerful press, by which pressure was produced on said boards by various means, sometimes by means of screw pressure, sometimes by hydraulic pressure. After the pressure was produced on the paper it was continued by allowing the press to remain with its pressure on to its fullest extent for ten or twelve hours or more, say from one night to the next morning, when the pressure was removed, the papers and boards taken from the press and separated by removing the boards from the pile of

combined boards and paper, and putting the boards on one side on one pile and making another pile of the printed papers. This was necessarily comparatively a slow process, inasmuch as with one press only as much printed paper as the press would hold when put between the boards could be pressed in about ten or twelve hours, so that where much work had to be done a number of such presses were necessary. It was also costly as to labor, because the sheets had to be placed between the boards and removed therefrom afterwards, which took much time, especially where, as in the case of fine work, only one sheet was placed between two boards; and when this was done comparatively few sheets could be pressed at once because the boards took up much more room than the paper did, they being quite thick."

It was to meet this condition that the Jones patent was conceived, and its object is stated to be first to "furnish a bulk-compressor device, to be used to prepare the matter properly before it is inserted in the dry-press proper, thus saving time or repeated travel by the latter, before the operation of tying; second, to furnish a dry-press proper in which the compressing parts or heads—that is, the base and plunger—are constructed dividedly, or with ways through them, to afford access through them, to readily insert and manipulate the twine, and to tie the bundles of paper while held compressed, thus securing the bundle together by a powerful tie, which, when they are removed from the press, retains its force *ad libitum;* third, a press-frame, having sides peculiarly set and arranged, and provided with longitudinal slots therein corresponding with the ways in the press-heads, above referred to, and for the same purpose, as well as to rightly lodge and center the paper with relation to the middle of the press-heads; fourth, certain ledges in the said press-frame and guides on the plunger thereof, to properly center different-sized sheets in press to secure the tie at the middle of the bundles both ways; fifth, a new process for treating printed and folded sheets of paper in dry-pressing, consisting of subjecting a collection of such sheets to pressure without the use of fuller-boards, and while under such pressure tying them into compact bundles, with end boards thereon;

then removing them immediately from the press, and allowing them to remain tied sufficiently long to fix and complete the dry-pressing."

The press is described in the patent with particularity, and illustrated by drawings. It may be said, generally, that it is a press in which bundles of signatures (sheets) are placed, at the end of which bundles rigid boards are attached to distribute the pressure which is exerted by the press. The press moves in a "trough formed" bed so mounted as to incline laterally "so that the folded-paper may securely lodge and carry therein while being operated on." Rectangular blocks are rigidly secured at both ends of the bed. The lower block is the base of what is called in the specifications " a divided head," constructed with " openings or ways." Opposing this there is a " plunger or follower," to which there is also attached a " divided head" having " openings and ways" between the parts of the head. The " openings and ways" are to enable the operator to pass his hand between the parts of the press and tie the bundles. The operation of the press is as follows: A bundle of signatures (sheets) with rigid boards at its ends is placed in the press, pressure is exerted by means of a screw (other means may be used) which passes through the upper block and operates on the plunger or follower and the " divided head" attached to it, and as the bundle rests on the lower block and its " divided head," it is evident that the pressure on the sheets will be in proportion to the power applied. While under pressure in the press the bundles are tied, access to them being had through the openings in the " divided head." The bundle is then removed from the press and allowed " to remain tied sufficiently long to fix and complete the dry pressing."

The advantage of the new method is that it is not so dilatory as the old and is more economical. In the old method the sheets, coming damp from the printing press, had to be dried before dry-pressing, and had also to be subjected to pressure in the press a number of hours to effect the smoothing (dry pressing) of the sheets. The quantity of the work, therefore, was limited by the number of presses. In other words, as expressed by one of the witnesses, " where much work had to be done a number of

such presses were necessary." And it was further testified that "it (the old method) was also costly as to labor, because the sheets had to be placed between the boards (fuller boards) and removed therefrom afterwards, which took much time, especially where, as in the case of fine work, only one sheet was placed between two boards, and when this was done comparatively few sheets could be pressed at once, because the boards took up much more room than the paper did, they being quite thick." In the new method there is no such limitations as to time, nor does it require the same expenditure of money. In the new method the initial pressure is applied in the press—the subsequent pressure necessary to remove the type indentations is continued in the tied up bundle. The operation, therefore, is comparatively rapid. "Putting the paper in the bundle," a witness testified, "tieing it up in a bundle and removing it therefrom," takes a few minutes. And the longer the sheets remain in the bundles the better the effect. Some time is necessary. Another advantage is claimed. It was testified that in the Jones method the sheets when folded have the convex impression of one half of the sheet brought in contact with the convex side of the other half of the sheet or of the sheet next to it, "and these convex impressions coming in contact with each other tend, when under pressure, to efface each other."

There is, however, no revelation in the specifications of the patent of the operation of opposing "convex impressions," nor a word to indicate that Jones was conscious of the advantage of that assistance to the pressure upon the sheets. The discovery seems to have been made by one of the witnesses, and also seems to have been disclaimed by Jones in the following question and answer :

"X–Q. 56. Throughout the testimony a good deal has been said about the advantages derived from your supposed invention from the fact of the type indentations being concaved or convexed, whatever that may mean. Is there anything said in the patent about that?

"A. No; neither do I claim that they are produced by my process."

There is a dispute as to the character of the patent. Appel-

lees contend that it is " a *process* of ' dry pressing ' *or removing type indentations from printed sheets* " (claim 5 of the patent). Second. " A *press* of peculiar construction and *adapted to the convenient carrying of this process into effect.* The novel features of which press are covered by claims one to four inclusive." The appellees contend that the patent is for a machine (claims 1 to 4) and also for a process (claim 5). And it is asserted the latter claim is but an operation or function of the machine. It is further contended that the machine and process were anticipated.

In discussing these contentions, it is not necessary to minutely observe the distinctions made and disputed by counsel. Even if the patent is primarily for a novel process, there is a claim for a novel press, and, by the consideration of the latter, we think, the validity of the former will be determined.

Was, then, the press anticipated, including broadly in the term the inquiry whether the press exhibited invention, in view of the prior state of the art? Anticipation is a question of fact, and the burden of establishing it is on the appellant. The patent bears a presumption of novelty and invention, and the lower courts, passing on the evidence, found against appellant's contention. Such united judgment this court accepts unless there is a clear showing to the contrary. *Brainard et al.* v. *Buck et al., ante*, p. 99. That showing appellant claims the record establishes, and even urges that presses of various kinds had become so familiar, before the Jones patent, that judicial knowledge can be invoked for them. Hay presses, cotton presses, tobacco, wool and other presses are instanced, all of which, it is said, were used for applying pressure to masses of matter to compact them into bundles, and in all of which the pressure was retained by strings, ropes or bands of some kind. But wherein those presses differed one from the other and received special characterization and utility would be a matter of proof, not of assumption, and wherein the Jones patent differs from either of them and has derived its special applicability is certainly not so clear that it is demonstrated against the judgment of the Supreme Court and the Court of Appeals of the District. Nor are we nearer that demonstration by the specific patents,

put in evidence by appellant. There is generic sameness we concede, but there are differences, and the Patent Office and both lower courts found novelty and invention in those differences.

The appellant introduced in evidence a patent issued to D. Kellogg, October 12, 1852, for a wool press; one to W. R. Dingham, October 20, 1863, for improvement in paper presses; one to S. Cooley, October 16, 1866, for a wool press; to Thomas Stibbs, September 19, 1871, for pressing yarn; to W. P. Craig, for a baling press; to Thomas G. Hardesty, for tobacco press; to G. B. Archer, for baling manure and other substances; to C. Brown, for baling short cut hay, and another for baling short cut straw; and a patent for a signature press to R. A. Hart. There was also testimony of the existence of a press used in the bookbindery of one John Palmer, in Philadelphia. The press was used in a later stage of bookbinding than "dry pressing," for the purpose of tying printed sheets into bundles for storing. It was an upright press with opposing platens or heads in which there were grooves to receive the cords by which the bundle was tied while under pressure.

There is a certain resemblance between all of the devices. They are all instruments for exerting pressure upon substances placed between compressing heads or followers to compact such substances into bundles and afford facilities for tying the bundles while they are under pressure. The Dingham patent, the one most relied on by appellant, may be selected for illustration.

The Dingham device is an "Improvement in Paper Presses," and the inventor claimed to have "invented a new and useful machine for combining and facilitating the operation of pressing and tying paper into reams or bundles," which he called "the combination paper press and tie engine."

There were defects in the art of pressing and tying paper very similar to the defects in the art of dry pressing "signatures," and Dingham described the former as follows:

"The process of pressing and tying paper now generally employed requires a large and somewhat expensive press, which is located in some corner of the finishing room, and as the paper comes from the machine it is carried to the finishing

table, there counted and folded, and when sufficient is obtained to fill the press (usually about one hundred reams) it is conveyed to the press and placed therein, and, by means of a large screw and follower, pressed for about twelve hours, or during the night. It is then removed and conveyed to the tie-table and there tied into reams. After this (it being, when it comes from the machine, usually double-crown, or double the length of the ordinary ream of wrapping paper) it is cut into two reams or single crown. The usual mode of tying paper is by passing a strong cord or twine around the ream, with a noose or loop at the end, through which the other end is passed, and then drawn upon with the hand until the loose ream or bundle is sufficiently compressed. This operation is laborious and tedious, occupying much time, requires strong twine, and unavoidably draws the ream away or the paper out of place."

This language is quite similar to that used by Jones and his witnesses to describe the defects which existed in the bookbinder's art, and the presses of the inventors also have similarity. In both sheets of paper are pressed by being placed between " compressing heads," which " are constructed dividedly," to use the words of the Jones patent, " separate and sufficiently disconnected (to use the language of the Dingham patent) to allow the string or cord for tying the paper to pass between." Each machine, therefore, comprises a compress and tie-table. In each there is the same rapidity of operation, the same economy of time and means, and in each the pressure first applied by the machine is retained by cords and continued in the bundle. And it is manifest that this retained and continued pressure, which has for its purpose in the Jones patent to remove type indentations from the sheets, and in the Dingham patent to retain the sheets in the bundle, adds nothing to the operation of the press of the former and detracts nothing from the operation of the press of the latter. But notwithstanding these resemblances we may ascribe invention to the Jones patent if it be confined to the press proper. In other words, the press may be regarded as a form, adapted to the bookbinder's art, and although preceded by the Dingham patent in a general way, may be considered as an invention of that form.

The fifth claim of the Jones patent—the claim for the proc-ess—must be viewed from a different standpoint. The first four claims of the patent, as we have said, describe the elements, " In a printer's and bookbinder's dry press and sheet tie.". The fifth claim is as follows :

" 5. The process herein described for treating folded printed sheets of paper in dry pressing, the same consisting of subject-ing a collection of such sheets to pressure without the use of fuller-boards, and while under such pressure tying them into a compact bundle with end boards, then removing them immedi-ately from the press, and allowing them to remain tied suffi-ciently long to fix and complete dry pressing."

The dependence, therefore, is not, as counsel for appellees contends, the press upon the process. It is the other way, the process upon the press ; for it is impossible to consider the fifth claim as describing anything but the operation and effect of the press. Indeed, the process is the whole value, the sole purpose of the press. What, indeed, is the process—what is the force at work ? And the inquiry is entirely independent of questions as to what constitutes a patentable process discussed by this court in *Risdon Locomotive Works* v. *Medart,* 158 U. S. 68, and in *Westinghouse* v. *Baden Power Brake Co.,* 170 U. S. 537. What, then, is the force at work and how is it applied ? It is force (pressure) applied to sheets of paper placed between " com-pressing heads." In other words, a special application of pres-sure begun in the press and continued in the bundle by means of strings and cords. This, however, is the operation and effect of the machine, and it is none the less so because the pressure is held indefinitely. Its existence in the bundle is not independ-ent of the press. The pressure is as much an effect in the bun-dle as when first applied. The pressure is applied by the press and so, substantially, are the bands or cords which continue the pressure, and we cannot assent to the view that the contin-uation of the pressure in the bundles with the consequence of removing type indentations in the printed sheets is anything but the natural and direct effect of the machine.

Infringement was put in issue by the pleadings and passed on by the lower courts. They found as a fact that all the claims

of the patent had been infringed by appellant. The finding is not absolutely disputed. The assignment of error is " that the patented machine used by defendant, in view of the state of the art preceding Jones' invention, did not infringe any claims of the patent in suit." That is, appellant contends that the evidence exhibits a complete anticipation, or so limits and narrows the Jones invention as to make the differences between the Jones press and that which was used by appellant more than formal. We have decided that the Jones press had not been anticipated, and both of the lower courts have found that the differences between it and appellant's press were not substantial. The evidence sustains the finding. The witnesses on behalf of appellees testified to the differences between the presses. They pointed out the essential resemblances of the presses and the merely formal character of the differences. There was no opposing testimony.

The accounting in the lower court, however, was had upon the basis of the validity of the process, (claim 5,) and therefore

*The judgment of the Court of Appeals must be reversed and the cause remanded, with directions to that court to reverse the judgment and decree of the Supreme Court and remand the cause to the latter court for further proceedings, in accordance with this opinion, and it is so ordered.*