55 CCPA

**Application of Zoltan TARCZY-HORNOCH.**

**Patent Appeal No. 7910.**

United States Court of Customs and Patent Appeals.

June 27, 1968.

Kirkpatrick, J., and Worley, C. J., dissented.

Flehr, Hohbach, Test, Albritton & Herbert, San Francisco, Cal. (John P. Sutton, San Francisco, Cal., of counsel), for appellant.

Joseph Schimmel, Washington, D. C. (Fred W. Sherling, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, SMITH, ALMOND, and KIRKPATRICK,* Judges.

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Consisting of McCann and Friedman, Examiners-in-Chief, and Andrews, Acting Examiner-in-Chief, opinion by McCann.

RICH, Judge.

This appeal is from a decision of the Patent Office Board of Appeals[1] affirming the examiner's rejection of claims 31–35 and 40 in appellant's application serial No. 23,739, filed April 21, 1960, entitled "Pulse Sorting Apparatus and Method." Claims 16–28, 29, 30, and 36–39 have been allowed.

The invention of the claims on appeal is a method for sorting or counting electrical pulses, effective in counting of such pulses of varying amplitudes even at extremely high repetition rates, i. e., at rates greater than 50,000,000 (50 megacycles) per second. Appellant's method envisions the use of a multistage apparatus. The first stage counts every pulse within its capacity. Cancelling orders in the form of "inhibit" pulses are then sent to each of the succeeding stages to prevent another counting of those same pulses. Should the initial stage be unable to handle a pulse, no cancellation order is given the second stage. The pulse, then, is counted by the second stage. Thereupon, cancellation orders are sent to succeeding stages.

Claim 31 is illustrative:

31. In a method for sorting a plurality of input pulses by utilizing a plurality of serially connected stages adapted to accept pulses, causing each input pulse to be applied to each stage sequentially in time, generating an inhibit pulse in each stage which accepts an input pulse and applying the inhibit pulse to each succeeding stage in substantial coincidence with the input pulse so that the input pulse is canceled to thereby prevent registration of the same input pulse in a succeeding stage.

The examiner allowed appellant's apparatus claims. However, he rejected all the method claims on the ground that they merely defined the function of

appellant's apparatus. In appeal to the board, appellant argued mainly against the propriety of the "function of the apparatus" rejection. However, this point, in the board's opinion, was foreclosed: "[T]he previous decisions by the Court of Customs and Patent Appeals are binding on us until overruled." The board did reverse the rejection of two of the method claims on a showing that the defined methods were capable of performance by apparatus other than that disclosed. The rejection of the other claims was affirmed.

The issue, therefore, is whether a process claim, otherwise patentable, should be rejected because the application, of which it is a part, discloses apparatus which will *inherently* carry out the recited steps. There is no contention that the claims on appeal can be saved by the "exceptions" to the doctrine, exempting claims for those processes capable of performance either manually or by another, dissimilar apparatus. See In re Parker, 79 F.2d 908, 23 CCPA 721 (1935).

We have determined that our decisions requiring the rejection of such claims are justified neither by history nor policy. Today we overrule those decisions.

The expression "function of an apparatus" [2] is our legacy of 19th century controversy over the patentability of processes. Early cases proscribed a kind of overweening claim in which the desirable result first effected by an invention was itself appropriated by the inventor. Two notorious examples will suffice.

Wyeth had obtained a patent for a machine for cutting ice into blocks of uniform size. His specification read: "It is claimed as new, to cut ice of a uniform size, by means of an apparatus worked by any other power than human. The invention of this art, as well as the particular method of the application of the principle, are claimed by * * * [Wyeth]." In an infringement suit, in 1840, Justice Story, sitting on circuit, held the claimed matter "unmaintainable" in point of law and a patent, granted for such, void as for an abstract principle and broader than the invention. "A claim broader than the actual invention of the patentee is, for that very reason, upon the principles of the common law, utterly void, and the patent is a nullity." Wyeth v. Stone, Fed.Cas. No. 18,107, 1 Story 273, 285–286 (C.C.Mass.1840).

The first comprehensive review of process patents by the Supreme Court was occasioned some thirteen years later by Morse's attempt to enforce his telegraph patent. Chief Justice Taney wrote the opinion for the Court, which held several apparatus claims valid and infringed. O'Reilly v. Morse, 56 U.S. (15 How.) 62, 14 L.Ed. 601 (1853). The only process claim in the Morse patent was the subject of separate discussion. The claim read:

Eighth. I do not propose to limit myself to the specific machinery or parts of machinery described in the foregoing specification and claims; the essence of my invention being the use of the motive power of the electric or galvanic current, which I call electro-magnetism, however developed for marking or printing intelligible characters, signs, or letters, at any distances, being a new application of that power of which I claim to be the first inventor or discoverer.

The Chief Justice commented:

If this claim can be maintained, it matters not by what process or machinery the result is accomplished. For aught that we now know some future inventor, in the onward march of science, may discover a mode of writing or printing at a distance by means of the electric or galvanic current, without using any part of the process or combination set forth in the plaintiff's specification. His invention may be less complicated—less liable to get out of order—less ex-

---

2. Alternatively, especially in early cases, "function of a machine."

pensive in construction, and in its operation. But yet if it is covered by this patent the inventor could not use it, nor the public have the benefit of it without the permission of this patentee.

\* \* \* \* \* \*

No one we suppose will maintain that Fulton could have taken out a patent for his invention of propelling vessels by steam, describing the process and machinery he used, and claimed under it the exclusive right to use the motive power of steam, however developed, for the purpose of propelling vessels.[3]

The claim was, of course, held invalid because it did not correspond in scope to Morse's invention. "[Professor Morse] \* \* \* has not discovered that the electro-magnetic current, used as motive power, in any other method and with any other combination, will do as well."[4] The Chief Justice also summarized the law in this area:

Whoever discovers that a certain useful result will be produced, in any art, machine, manufacture, or composition of matter, by the use of certain means, is entitled to a patent for it; provided he specifies the means he uses in a manner so full and exact, that any one skilled in the science to which it appertains, can, by using the means he specifies, without any addition to, or subtraction from them, produce precisely the result he describes. And if this cannot be done by the means he describes, the patent is void. And if it can be done, then the patent confers on him the exclusive right to use the means he specifies to produce the result or effect he describes, and nothing more. And it makes no difference, in this respect, whether the effect is produced by chemical agency or combination; or by the application of discoveries or principles in natural philosophy known or unknown before his invention; or by machinery acting altogether upon mechanical principles. In either case he must describe the manner and process as above mentioned, and the end it accomplishes. And any one may lawfully accomplish the same end without infringing the patent, if he uses means substantially different from those described.

The latter exposition apparently cast some doubt on the validity of claims for processes generally, whether mechanical or not. See Risdon Locomotive Works v. Medart, 158 U.S. 68, 75, 15 S.Ct. 745, 39 L.Ed. 899 (1894); Tilghman v. Proctor, 102 U.S. 707, 726, 26 L.Ed. 279 (1880); O'Reilly v. Morse, 56 U.S. (15 How.) 62 (1853) (Grier, J., dissenting). It shortly became clear, however, that the patentability of chemical processes at least had been unaffected. In Corning v. Burden, 56 U.S. (15 How.) 252, 14 L.Ed. 683 (1853), a case decided after *Morse* but during the same term, the issue was whether Burden's ambiguous claim was properly interpreted as for a process. The patent was ostensibly directed toward a machine for rolling puddle balls in the manufacture of iron. But the lower court had instructed the jury that the patent was for a new *method* of converting puddle balls to blooms "by continuous pressure and rotation \* \* \* between converging surfaces." The Supreme Court held the claim limited to the machine, since, in the Court's mind, a contrary decision would call into question the validity of the claim.[5] In an influential aside on the way to this conclusion, Justice Grier, for a unanimous Court, discussed the patentability of processes:

A process, *eo nomine*, is not made the subject of a patent in our act of

3. 56 U.S. (15 How.) at 113.

4. 56 U.S. (15 How.) at 117.

5. The Court reasoned that the law's requirement for a description of the invention may have been ignored if the patent were interpreted as for a process. 56 U.S. (15 How.) at 269.

Congress. It is included under the general term "useful art." An art may require one or more processes or machines in order to produce a certain result or manufacture. The term machine includes every mechanical device or combination of mechanical powers and devices to perform some function and produce a certain effect or result. But where the result or effect is produced by chemical action, by the operation or application of some element or power of nature, or of one substance to another, such modes, methods, or operations, are called processes. A new process is usually the result of a discovery; a machine, of invention. The arts of tanning, dyeing, making water-proof cloth, vulcanizing India rubber, smelting ores, and numerous others are usually carried on by processes, as distinguished from machines. One may discover a new and useful improvement in the process of tanning, dyeing, &c., irrespective of any particular form of machinery or mechanical device. And another may invent a labor-saving machine by which this operation or process may be performed, and each may be entitled to his patent. As, for instance, A has discovered that by exposing India rubber to a certain degree of heat, in mixture or connection with certain metallic salts, he can produce a valuable product or manufacture; he is entitled to a patent for his discovery, as a process or improvement in the art, irrespective of any machine or mechanical device. B, on the contrary, may invent a new furnace or stove, or steam apparatus, by which this process may be carried on with much saving of labor, and expense of fuel; and he will be entitled to a patent for his machine, as an improvement in the art. Yet A could not have a patent for a machine, or B for a process; but each would have a patent for the means or method of producing a certain result, or effect, and not for the result or effect produced. It is for the discovery or invention of some practicable method or means of producing a beneficial result or effect, that a patent is granted, and not for the result or effect itself. It is when the term process is used to represent the means or method of producing a result that it is patentable, and it will include all methods or means which are not effected by mechanism or mechanical combinations.

But the term process is often used in a more vague sense, in which it cannot be the subject of a patent. Thus we say that a board is undergoing the process of being planed, grain of being ground, iron of being hammered, or rolled. Here the term is used subjectively or passively as applied to the material operated on, and not to the method or mode of producing that operation, which is by mechanical means, or the use of a machine, as distinguished from a process.

In this use of the term it represents the function of a machine, or the effect produced by it on the material subjected to the action of the machine. But it is well settled that a man cannot have a patent for the function or abstract effect of a machine, but only for the machine which produces it.

The dictum is interesting for its reflection of the context in which the "function of a machine" objection to patentability was initially applied. It is clear that some processes were thought patentable and others not. It is also clear that "function of a machine" was symbolic of the latter. It is yet unclear, at this point in the development of the law, whether the dividing line marks a difference between means and result or chemistry and mechanics. In any event, the simple notion of undue breadth has been abandoned or, at least, considerably refined.

Several subsequent cases upheld process patents. Cochrane v. Deener, 94 U.S. 780, 24 L.Ed. 139 (1876); Tilghman v. Proctor, 102 U.S. 707, 26 L.Ed. 279 (1880). In the first of these a patent

for a process for sifting flour was held valid and infringed. Justice Bradley wrote for the Court:

That a process may be patentable, irrespective of the particular form of the instrumentalities used, cannot be disputed. If one of the steps of a process be that a certain substance is to be reduced to a powder, it may not be at all material what instrument or machinery is used to effect that object, whether a hammer, a pestle and mortar, or a mill. Either may be pointed out; but if the patent is not confined to that particular tool or machine, the use of the others would be an infringement, the general process being the same. A process is a mode of treatment of certain materials to produce a given result. It is an act, or a series of acts, performed upon the subject-matter to be transformed and reduced to a different state or thing. If new and useful, it is just as patentable as is a piece of machinery. In the language of the patent law, it is an art. The machinery pointed out as suitable to perform the process may or may not be new or patentable; whilst the process itself may be altogether new, and produce an entirely new result. The process requires that certain things should be done with certain substances, and in a certain order; but the tools to be used in doing this may be of secondary consequence.[6]

This discussion as well as the validation itself of the flour-sifting process seemed to show that the connotation of the "function of a machine" rejection was not an objection to mechanical processes but rather to mere effects masquerading as processes.

Justice Bradley's language in Tilghman v. Proctor tended to reinforce this idea. In that case although the process in question was a chemical one,[7] he again took up the patentability of proc-esses in general and discussed, among other cases, O'Reilly v. Morse, supra, to show that Chief Justice Taney "fully acquiesced in the legality and validity of a patent for a process." The "true ground" of that decision, the opinion points out, was that Morse's eighth claim was directed to a principle, not a process, a claim to a power of nature itself by one who had only first employed that power.

In the Telephone Cases, 126 U.S. 1, 8 S.Ct. 778, 31 L.Ed. 863 (1887), the Court reiterated this theme in upholding the validity of Bell's fifth claim which read:

5. The method of, and apparatus for, transmitting vocal or other sounds telegraphically, as herein described, by causing electrical undulations, similar in form to the vibrations of the air accompanying the said vocal or other sounds, substantially as set forth.

It was urged that the decision in O'Reilly v. Morse required that this claim be held invalid. Chief Justice Waite, who wrote for the Court, replied that that case, on the contrary, required validation of the claim. Bell's claim, he observed, was for a method of using electricity, not for electricity "in its natural state."

The Court made it clear that as long as the claim delineated *a means and not a result*, the inventor would not be penalized for having invented the *only* means for effecting the result.

It may be that electricity cannot be used at all for the transmission of speech, except in the way Bell has discovered, and that therefore, practically, his patent gives him its exclusive use for that purpose, but that does not make his claim one for the use of electricity distinct from the particular process with which it is connected in his patent. It will, if true, show more clearly the great import-

---

6. 94 U.S. at 787–788.

7. The claim read: "I claim * * * manufacturing of fat acids and glycerine from fatty bodies by the action of water at a high temperature and pressure."

ance of his discovery, but it will not invalidate his patent.[8]

Only a few years later, however, the Court seemed to turn away from the means-result dichotomy.[9] In Risdon Locomotive Works v. Medart, 158 U.S. 68, 15 S.Ct. 745, 39 L.Ed. 899 (1894), the validity of a patent for a process of manufacturing belt pulleys was in issue. The process involved the following steps: centering the pulley center or spider; grinding the ends of the arms of the spider concentrically with the axis of the pulley; boring the center; securing the rim to the spider; grinding the face of the rim concentrically with the axis of the pulley; and grinding or squaring the edges of the rim. The Court rightly observed that the process was "purely a mechanical one" and proceeded to declare it unpatentable. The Court's reasoning began with an analysis of the "great case" of O'Reilly v. Morse, supra, and asked whether Chief Justice Taney's comments on "processes involving chemical effects" were not too broad to be supported by subsequent cases. After a review of several of those cases, the Court concluded that the validity of process patents had, in fact, been upheld when the process was chemical or involved the use of one of the agencies of nature for a practical purpose. 158 U.S. at 77, 15 S.Ct. 745. See e. g., Telephone Cases, supra; New Process Fermentation Co. v. Maus, 122 U.S. 413, 7 S.Ct. 1304, 30 L.Ed. 1193 (1887).

The Court then cited Corning v. Burden, supra; Wyeth v. Stone, supra, and several fairly contemporaneous circuit court decisions for the proposition that

it was "equally clear" that no valid patent could be obtained "for a process which involves nothing more than the operation of a piece of mechanism, or, in other words, for the function of a machine." The patent in issue was, of course, invalid since "it clearly falls within this category." The Court explained:

> \* \* \* it is upon its face "for an improved process of manufacture," and mechanism is shown and described simply for the purpose of exhibiting its operation, which is described in detail. The result is a pulley more perfectly balanced, more faultless in shape, stronger, and more durable, perhaps, than any before produced; but this was not because the patentee had discovered anything new in the result produced, but because the mechanism was better adapted to produce that result than anything that had before been known. As pulleys of that description had been produced before, doubtless, with greater care in the manufacture of them, a pulley as perfect as his might have been made. So that all [that] he invented in fact was a machine for the more perfect manufacture of such pulleys. The operation or function of such machine, however, is not patentable as a process.

This decision was understandably taken as proscribing patents for mechanical processes. Whitney, Patentable Processes, 19 Harv.L.Rev. 30, 33 (1905). And this impression could only have been reinforced by Westinghouse v. Boyden Power Brake Co., 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1897), in which the Court held certain claims for a brake

---

**8.** It was also argued that the patent should be restricted to the apparatus claimed, "the magneto instrument." A "variable resistance apparatus" had been disclosed but not claimed. The Court said:

> The patent is both for the magneto and variable resistance *methods*, and for the particular magneto *apparatus* which is described, or its equivalent. There is no patent for any variable resistance apparatus. It is undoubtedly true that when Bell got his patent he thought the magneto method was

the best. Indeed, he said, in express terms, he preferred it; but that does not exclude the use of the other, if it turns out to be the most desirable way of using the process under any circumstances.

**9.** By "means-result dichotomy" we refer to the division of patentable and unpatentable claims along the line separating claims which define means and those which merely describe results.

mechanism not infringed. The Court observed that if the claims were interpreted as process claims, as the patentee urged, they would be open to the "mere function of a machine" objection. The Court noted that *Risdon* was conclusive against such process claims, unless, perhaps, those capable of manual operation were exempted from its strictures as several lower court cases had held. On the latter possibility the Court felt that the facts before it did not warrant an expression of opinion.

It was at this unfortunate time that our predecessor in jurisdiction of appeals from the Patent Office, the Court of Appeals of the District of Columbia, attempted a synthesis of the cases on "function of an apparatus." In re Weston, 17 App.D.C. 431 (1901). The Commissioner of Patents had rejected certain claims for a process of manufacturing devices used in electrical measuring instruments.[10] The question before the court on appeal from the Commissioner was "the greatly-vexed one, how far a method or a process is patentable, and when it is a subject of patentability."

The court reviewed the case law, with great emphasis on the Supreme Court's most recent pronouncements on the subject, viz., *Risdon* and *Westinghouse,* and came to the following conclusion.[11]

It seems to us from all these authorities the deductions to be drawn are these: First, that processes involving a chemical or other elemental action, if new and useful, are patentable; second, that a process, which amounts to no more than the mere function of a machine, is not patentable; third, that a process or method of a mechanical nature, not absolutely dependent upon a machine, although perhaps best il-

---

10. The claimed matter was as follows:

1. The described method of manufacturing a symmetrical movable coil for an electrical measuring instrument, consisting in first forming a supporting frame or spool by subjecting a short tube of metal to pressure until the desired conformation and shape is obtained, then winding the coil thereon and finally securing the pivot-pins thereto in the axial line of the coil.

2. The described method of manufacturing a movable coil for an electrical measuring instrument, consisting in first forming a supporting frame or spool of a single piece of metal by subjecting the same to pressure until the desired conformation and shape is obtained, winding the coil thereon and then securing the pivot-pins thereto in the axial line of the coil and simultaneously adjusting the needle-supporting pivot in such manner that the point of the needle is located in the central plane of coil, or in a plane at a definite angle thereto.

3. The described method of manufacturing a supporting frame or spool without joint or seam for an electrical coil, consisting in giving to a short section of tubing the desired configuration, then subjecting it to pressure until the desired curvature is obtained, and finally turning down the lateral edges thereof in such manner as to constitute the flanges of the frame or spool.

4. The described method of manufacturing a supporting frame or spool without joint or seam for an electrical coil, consisting in giving a short section of tubing the desired configuration, then giving to the lateral faces thereof the desired curvature to adapt it to the curvilinear field in which it is designed to be used, and finally turning down the lateral edges thereof so as to constitute the flanges of the frame or spool.

11. The decision of the Commissioner with respect to claims 3 and 4 was affirmed: "[T]hey involve merely well-known mechanical operations." The decision with respect to claims 1 and 2, however, was reversed, applying the test for patentable processes set forth:

It does not appear to us that the mechanism which he uses for the purpose of such adjustment is a necessary part of his process. He might possibly effect the purpose by mere manipulation. It is not impossible that he might effect it by mechanism of a radically different character from that which he exhibits. Ordinarily a process can be carried into practical effect by mechanism only; and it is the function of such mechanism to effect the process. But the process and the function of the mechanism are not for that reason one and the same thing in law or in our conception of the discovery.

lustrated by mechanism, may, if new and useful, be the proper subject of a patent, even though it involves no chemical or other elemental action.

In this last class of cases, possibly a very large class, and thus far certainly a very indefinite class, the criterion of patentability, so far as it seems possible yet to state any definite criterion, would seem to be that the process may be performed by hand or by other mechanism than that exhibited, although perhaps not with equal efficiency. That we must at all events recognize the existence of such a class would seem to be beyond doubt.

It is probably more than a quibble to inquire whether the *Telephone Cases* are at all reconcilable with the ban on processes not chemical or, in fact, whether *Risdon* will support the exemption for those capable of manual operation. Under the circumstances, however, it could hardly be unexpected that a wrap-up of the law would leave a corner or two protruding. This was underscored by the next Supreme Court decision on the patentability of processes. In Busch v. Jones, 184 U.S. 598, 22 S.Ct. 511, 46 L. Ed. 707 (1902), the Court upheld four apparatus claims for a new paper press but found invalid the following process claim:

> 5. The process herein described for treating folded printed sheets of paper in dry pressing, the same consisting of subjecting a collection of such sheets to pressure without the use of fuller-boards, and while under such pressure tying them into compact bundles with end boards, then removing them immediately from the press, and allowing them to remain tied sufficiently long to fix and complete dry pressing.

The inquiry, the Court insisted, was "entirely independent of questions as to what constitutes a patentable process discussed * * * in Risdon Locomotive Works v. Medart * * * and in Westinghouse v. Baden [sic, Boyden] Power Brake Co. * * *." Nonetheless the process was held to be no more than the operation and effect of a machine and apparently held invalid for that reason.

The Supreme Court, however, was not finished with patents for mechanical processes. In a leading case, Expanded Metal Co. v. Bradford, 214 U.S. 366, 29 S.Ct. 652, 53 L.Ed. 1034 (1908), upon which the Patent Office here principally relies, the Court sustained a patent for a process for making "expanded metal," over the express contention of the infringers that *Risdon* and *Corning* restricted patents to processes involving chemical action. The Court commented that it was not disposed to question the *decision* in those cases. However, it did not feel that the unpatentability of mechanical processes had been established by them. Cases subsequent to *Risdon*, the Court pointed out, showed that its language should not be taken as an absolute proscription of patents for mechanical prosesses. The Court quoted the passage from Westinghouse v. Boyden Power Brake Co.[12] which admitted the possibility, at least, of patents for mechanical processes susceptible of performance "by simple manipulation."

The Court also appealed to text writers and its own previous decisions:

> What, then, is the statutory right to a patent for a "process" when the term is properly considered? Curtis, in his work on the Law of Patents, says:

> "A process may be altogether new, whether the machinery by which it is carried on new or old. A new process may be invented or discovered, which may require the use of a newly-invented machine. In such [a] case, if both the process and the machine were invented by the same person, he could take separate patents for them. A new process may be carried on by the use of an old machine, in a mode in which it was never used before * * *. In such a case, the patentability of the process in no degree depends upon the characteristic principle

12. Written by Justice Brown who also wrote for the Court in *Risdon*.

of the machine, although machinery is esential to the process, and although a particular machine may be required." Curtis, 4th ed. § 14, note.

In Robinson on Patents, vol. 1, § 167, it is said:

"While an art cannot be practiced except by means of physical agents, through which the force is brought in contact with or [is] directed toward its object, the existence of the art is not dependent on any of the special instruments employed. It is a legal, practical invention in itself. Its essence remains unchanged, whatever variation takes place in its instruments as long as the acts of which it is composed are properly performed."

And Walker on Patents, 4th ed. § 3, states that valid process patents may be granted for "operations which consist entirely of mechanical transactions, but which may be performed by hand or by any of several different mechanisms or machines."

It is undoubtedly true, and all the cases agree, that the mere function or effect of the operation of a machine cannot be the subject-matter of a lawful patent. But it does not follow that a method of doing a thing, so clearly indicated that those skilled in the art can avail themselves of mechanism to carry it into operation, is not the subject-matter of a valid patent. The contrary has been declared in decisions of this court. A leading case is Cochrane v. Deener, 94 U.S. 780, [24 L.Ed. 139,] in which this court sustained a process patent involving mechanical operations * * *.

The Court's conclusion was "that an invention or discovery of a process or method involving mechanical operations, and producing a new and useful result, may be within the protection of the Federal statute, and entitle the inventor to a patent for his discovery." This conclusion, combined with the Court's earlier approving comments on the "function * * * of a machine" objection to

patentability emptied that phrase of its purported equivalence to "mechanical processes." The Court's specific equation of "function of a machine" with "effect of the operation of a machine" was less effective than it might have been to restore the means-result distinction, discernable in almost all the cases before *Risdon*, since it occurred in the shadow, as it were, of the quoted passages from the *Westinghouse* opinion and the Walker text. It is, in fact, on these incidental, almost neutral, references that the solicitor now relies to show the Court's imprimatur upon the *Weston* view of "function of a machine." That the Court meant to adhere to the means-result dichotomy seems fairly clear when the *Expanded Metal* opinion is read against the background of seventy years' opinions on patentability of processes and when it is recalled that *Risdon* and (perhaps) *Westinghouse* represent the only substantial deviations from the means-result test in the Supreme Court's history.

The Court seems to have confirmed this interpretation the last time this issue was before it. In Waxham v. Smith, 294 U.S. 20, 55 S.Ct. 277, 79 L. Ed. 733 (1934), the Court held valid and infringed a claim to a process for incubating eggs. It was argued that the claim was an attempt to patent a function. The Court replied:

But the function which a machine performs, here the hatching of eggs, is to be distinguished from the means by which that performance is secured * * *. A method, which may be patented irrespective of the particular form of the mechanism which may be availed of for carrying it into operation, is not to be rejected as "functional", merely because the specifications show a machine capable of using it.

The *Expanded Metal* and *Waxham* processes could have been performed in some manual fashion or by apparatus different from that disclosed by the patents. The cases are not, on their facts, therefore, at

variance with the *Weston* recapitulation of the law. Thus *Weston* has survived.[13]

In the Court of Customs and Patent Appeals, the *Weston* views have more than survived, they have flourished. In In re Ernst, 71 F.2d 169, 21 CCPA 1235 (1934), the *Weston* doctrine was embraced by this court. Appellant's reliance on *Expanded Metal* was unavailing —the court relied on the possibility of manual operation and distinguished that case. The "mere function of an apparatus" rejection was regularly upheld thereafter. See, e. g., In re McCurdy, 76 F.2d 400, 22 CCPA 1140 (1935); In re Wadman, 94 F.2d 993, 25 CCPA 936 (1938); In re Mead, 127 F.2d 302, 29 CCPA 1001 (1942); In re Solakian, 155 F.2d 404, 33 CCPA 1054 (1946); In re Nichols, 171 F.2d 300, 36 CCPA 759 (1948); In re Ashbaugh, 173 F.2d 273, 36 CCPA 902 (1949); In re Horvath, 211 F.2d 604, 41 CCPA 844 (1954); In re Gartner, 223 F.2d 502, 42 CCPA 1022 (1955).

The Patent Office Board of Appeals has generally followed the direction of this court on the "function of the apparatus" rejection.[14] See Ex parte Goldsmith, 94 USPQ 403 (Pat.Off.Bd.App. 1952); Ex parte Wright, 72 USPQ 196 (Pat.Off.Bd.App.1946); Ex parte Hunter, 34 USPQ 337 (Pat.Off.Bd.App.1937). In 1952, however, Examiner-in-Chief Bailey wrote a dissenting opinion in Ex parte Goldsmith, supra, in which he listed Supreme Court decisions bearing upon the "function of the apparatus" rejection. He concluded:

The above Supreme Court decisions when all are considered and correlated hold:

(1) That useful methods are statutory subject matter, whether they involve chemical or other elemental action, or are purely mechanical, and when a claim in fact defines a method its patentability is determined by comparison with the prior art.

(2) That the mere function or effect of a machine is *not a method,* and thus not statutory subject matter, so when a claim that purports to define a method, is found to in fact define only the desired function or effect (and *not* the acts or steps which result in the desired function or effect), it is properly refused or held invalid on such grounds.

Mr. Bailey did not argue that the board majority's adherence to the *Weston* rule was at variance with the decisions of this court. Rather, he urged that those decisions should not be followed in view of their inconsistency with decisions of the Supreme Court. See also Ex parte Hart, 117 USPQ 193 (Pat.Off.Bd.App. 1957) (concurring opinion); Ex parte Roth, 118 USPQ 112 (Pat.Off.Bd.App. 1957) (concurring opinion).

Ten years later Mr. Bailey wrote the majority opinion in In re Symons, 134 USPQ 74 (Pat.Off.Bd.App.1962), in which the rejection of certain process

---

13. The *Weston* tests for the patentability of processes have become the conventional wisdom. See, e. g., Black-Clawson Co. v. Centrifugal Eng'r Corp., 83 F.2d 116 (6th Cir. 1936); In re Ernst, 71 F.2d 169, 21 CCPA 1235 (1934); Chisholm-Ryder Co. v. Buck, 65 F.2d 735 (4th Cir. 1933); Ferro Engineering Co. v. Watson, 151 F.Supp. 167 (D.D.C.1957). Lapses from orthodoxy have been few. But see C. F. Mueller Co. v. A. Zeregas Sons, 12 F.2d 517 (2d Cir. 1926); Societe Anonyme Des Manufacturers, etc. v. Marzall, 108 F.Supp. 310 (D.D.C. 1952); and several opinions of the Patent Office Board of Appeals discussed infra.

14. Some deviation from the doctrine has been tolerated under the guise of permitting latitude in claim drafting. See, e. g., Ex parte Stephanoff, 81 USPQ 565 (Pat. Off.Bd.App.1948); Ex parte Lorenz, 11 USPQ 105 (Pat.Off.Bd.App.1931); Ex parte Fahrenwald, 3 USPQ 191 (Pat. Off.Bd.App.1929). And, in other cases, the board has emphasized a requirement that the disclosed apparatus be incapable of utilization in other processes, i. e., that the process be the inherent (necessary) function of the apparatus. See Ex parte Scherer, 103 USPQ 107 (Pat.Off.Bd.App.1954); Ex parte Coburn, 87 USPQ 222 (Pat.Off.Bd.App. 1950); Ex parte Harnett, 61 USPQ 100 (Pat.Off.Bd.App.1944).

claims as a function of the apparatus was reversed, primarily because the processes were capable of operation by different apparatus and, additionally, because the rejection was thought inconsistent with the Patent Act of 1952. The latter conclusion was predicated upon the provisions in the act for the patentability of processes eo nomine and of new uses of old machines as processes. 35 U.S.C. §§ 100, 101 (1964); cf. Ex parte Kangas, 125 USPQ 419 (Pat.Off.Bd.App.1960). It was also based on the mandatory language of the statute: "A person shall be entitled to a patent unless—* * *." 35 U.S.C. § 102 (1964); see In re Stempel, 241 F.2d 755, 44 CCPA 820 (1957); In re Ratti, 270 F.2d 810, 46 CCPA 976 (1959).

*Ex parte Symons* was overruled the following year by a specially convened panel of seven members of the board. Ex parte Packard, 140 USPQ 27 (Pat. Off.Bd.App.1963). In *Packard,* a majority reversed a rejection of three method claims for defining *merely* the function of the apparatus when it was shown that the apparatus was capable of other uses.[15] The majority then went on "to re-evaluate and restate the position of the Board of Appeals" on the function of the apparatus rejection. That position, in essence, was that no statutory basis was required to sustain these rejections and that, if one were required, 35 U.S.C. § 112 might well suffice. The opinion concluded:

> While there is some doubt in our minds as to the equity of rejecting otherwise proper method claims as being drawn to the function of the apparatus, nevertheless, we are of the opinion that *the several decisions of the Court of Customs and Patent Appeals before and after the 1952 Patent Act affirming this ground of rejection are binding on us unless and until this ground of rejection is expressly overruled* by the Court of Customs and Patent Appeals. Insofar as the decision of Ex parte Symons is inconsistent with our present holding, it is overruled. [Emphasis ours.]

Two members of the board, one of whom was Mr. Bailey, dissented. Mr. Bailey noted that *all members of the special panel agreed on the proposition that such rejections are inequitable.*

The issue in this case, therefore, is whether this court will continue to insist upon the connotation its decisions and those of its predecessor in jurisdiction have breathed into the "function of an apparatus" symbol or will restore to that phrase its former meaning.

Appellant argues that the "function of the apparatus" doctrine as it is presently conceived is historically unsound, devoid of statutory basis, and at variance with the new Congressional policy evidenced by the Patent Act of 1952.

The solicitor, on the other hand, argues that the present doctrine is required by Expanded Metal Co. v. Bradford, supra. He urges, in rebuttal, that no specific prohibition is required to reject a claim as embracing non-statutory subject matter, and that there has been no shift in Congressional policy.[16]

Our present review of the major precedents has persuaded us that the decisions of the Supreme Court have not required the rejection of process claims merely because the process apparently could be carried out only with the disclosed apparatus. These rejections have been the product of decisions in the lower courts and especially in this court. We decide today that we will no longer follow those decisions.[17]

15. See note 14, supra.

16. Our decision makes unnecessary any consideration of appellant's arguments directed to the need for statutory bases for rejections or for alignment of this court's approach with current Congressional policy. Nor need we consider the solicitor's rebuttal.

17. "Surely we are not bound by reason or by the considerations that underlie *stare decisis* to persevere in distinctions taken in the application of a statute

In taking this step we are moved, to some extent, by the fact that the doctrine has been shown not to proceed from its purported well-springs. Even so, we would leave it undisturbed were it not the product of an essentially illogical distinction unwarranted by, and at odds with, the basic purposes of the patent system and productive of a range of undesirable results from the harshly inequitable to the silly.

The illogic of the "function of the apparatus" objection to patentability was clearly seen by Robinson even before it was fastened on our jurisprudence. He observed:

> Where a process consists entirely in the operation of a machine or other instrument, it approaches so nearly to the function of the instrument employed that several decisions have been rendered identifying it therewith, and hence denying its patentability. But the process and the function are, after all, two entirely separate entities, both in intellectual and physical contemplation; the former being capable of conception apart from any object acted on, the latter, not so. The difficulty is another form of the old confusion between the end and the means, and is to be avoided by defining sharply the end to be accomplished, and determining whether the machine or the operation performed by it is the actual means. *For if the operation performed by the machine is new in reference to the object upon which it is employed, a new process has been invented; and this is no less true if the machine or instrument employed is new than if it were old, or if the process can be performed in no other known way than by this particular machine.* While, on the other hand, if the operation is known in reference to the object, the invention of a new machine for performing it does not make a new process, but only a new instrument for applying it.[18] [Emphasis ours.]

We agree with this analysis. We feel that the basic rationale of the patent system demands the upholding of properly drawn claims for new, useful, and unobvious processes, regardless of whether the inventor has invented one, two, or more machines to carry them out. Cf. Waxham v. Smith, supra.

Exceptional treatment for this narrow class of processes is, pro tanto, inconsistent with the broad goal of the patent system, the promotion of the useful arts, in that it necessarily denies to certain inventors the exclusive rights to their discoveries and thus defeats the intent which must be presumed of Congress in enacting the Patent Statutes.

We think there is no merit in the suggestion that § 112 of the Patent Act of 1952 sanctions such a practice. See Ex parte Packard, supra. Section 112 does require that the specification conclude with claims which particularly point and distinctly claim the subject matter which is regarded as the invention. But the "mere function of the machine" cases do not involve imprecisely defined subject matter. The notion of undue breadth in the claims may be consistent with the proscription of claims directed merely to effects or results. See O'Reilly v. Morse, supra. The "mere function of the machine" cases, however, have clearly regarded the question as whether the processes at bar were within the statutory classes of invention. The emphasis has never been on the *claims* but always on the *processes*. The inquiry has been into whether these are "proper subjects" for a patent after a reference, more often than not, to the celebrated observation in Corning v. Burden, supra, that although it is included under the general term *useful art,* "a process *eo nomine* is not made the subject of a patent" by our laws. See, e. g., *In re Weston,* supra.

which, on further examination, appear consonant neither with the purposes of the statute nor with this Court's own conception of it." Helvering v. Hallock, 309 U.S. 106, 122, 60 S.Ct. 444, 453, 84 L.Ed. 604 (1940).

18. 1 Robinson, Patents 256 n. 2 (1890); see also Whitney, op. cit. supra at 48.

Furthermore, during the entire gestation period of the "function of the apparatus" objection, the patent statutes contained the following or a similar provision:[19]

[The inventor] shall particularly point out and distinctly claim the part, improvement, or combination which he claims as his invention or discovery.

The provision, indistinguishable for our purposes from the present statute,[20] was never referred to at all, as far as we know, in the elaboration of the "function of the apparatus" rejection. And we see no indication in the legislative history of § 112 or in the commentary on the section that there was contemplated any change in the significance of its provision for claims. See Federico, Commentary on the New Patent Act, 35 U.S.C.A. 1 (1954).

Furthermore, perpetuation of this doctrine only invites inequitable consequences. The essential difficulty is in the fact that, although at the time of the application only one apparatus may be known which is capable of carrying out the process, others may become available later. In which case, of course, the inventor may be cheated of his invention. It is peculiarly our responsibility to see that the decisional law does not require this kind of inequity.

In the *Telephone Cases,* supra, it was pointed out that Bell's invention, primarily a method, would have been lost to him had his process claim been held invalid since he had failed to claim the apparatus which later became commercially important. But the Court upheld the method claim: "Surely, a patent for such a discovery is not to be confined to the mere means he improvised to prove the reality of his conception." We think it clear that justice militates against so confining any process patent.

This case illustrates one of the peculiarities of the doctrine. Several method claims, generic to those rejected, have been allowed, simply because they admit of operation by two sets of apparatus. This would suggest that any two process claims, each unpatentable under the "function of the apparatus" theory could be merged into a patentable claim. We see no interest of the Patent System well served by such a practice.

Accordingly, the decision of the board is reversed.

Reversed.

KIRKPATRICK, Judge (dissenting), with whom WORLEY, Chief Judge, joins.

In order to reverse the decision of the Patent Office Board of Appeals, the majority overrules a line of decisions of this court affirming and applying a rule which is about as solidly established as any rule of the patent law. Beginning with a decision in 1901 of the Court of Appeals for the District of Columbia, the predecessor of this court in jurisdiction of appeals from the Patent Office, the rule that a process which amounts to no more than the mere function of a machine is not patentable has been consistently followed over a period of nearly seventy years. So far as I know, the rule has been generally acquiesced in and accepted, and has been applied in a score or more of cases in this court without challenge.

The question presented by this appeal is therefore whether this court is now justified in disregarding the rule of *stare decisis* which all agree is vital to

---

19. Act of July 8, 1870, ch. 230, § 26, 16 Stat. 201. The earlier statute provided: [The inventor] shall particularly specify and point out the part, improvement, or combination, which he claims as his own invention or discovery. Act of July 4, 1836, ch. 357, § 6, 5 Stat. 117.

20. The present statute reads:
The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.
35 U.S.C. § 112 (1964).

the preservation of the uniformity and predictability of the law. In such a situation, the principles by which the court should be guided are clear and well settled.

In a system of jurisprudence founded upon *stare decisis,* as our system is, an established rule or principle will not be departed from except in case of grave necessity when cogent reasons require such departure. If a rule of law, well established by decisions, is erroneous, it is still not to be lightly set aside by the courts but any abandonment or alteration of it should be by the legislature, the body charged with the responsibility of making the law and not by us whose only duty is to define and construe it.

Accepting then, the proposition that a heavy burden rests upon those who go about upsetting thoroughly settled precedent, it appears to me that the reasons advanced in the majority opinion for doing so in this case are wholly insufficient to justify its decision. I have no fault to find with the scholarly and scrupulously fair review and analysis of the development of the rule, which appears in the majority opinion. It may well be that "the decisions of the Supreme Court have not required the rejection of process claims merely because the process apparently could be carried out only with the disclosed apparatus." But note also that no decision of the Supreme Court has disapproved of the rejection of process claims for that reason. I do not dispute that "the doctrine has been shown not to proceed from its purported well-springs," and it may have been the product of an essentially illogical distinction. However, I cannot agree that it is at odds with the basic purposes of the patent system or that "it is productive of a range of undesirable results from the highly inequitable to the silly" or that the rule

denies to certain inventors the exclusive rights to their discoveries or that, in some cases, "the inventor may be cheated of his invention."

I cannot overlook the fact that there has been no showing that the practical working of the rule has been other than entirely satisfactory. The patent bar which exists for the purpose of obtaining patent rights for those who invent any new or useful process, machine, manufacture or composition of matter and has been always vigilant to protect those rights has not, to my knowledge, made any effort at any time to change the rule and one wonders why not if it is a rule so destructive of the rights of inventors and so subversive of the basic purpose of the patent system as the majority fears.

Nor has Congress seen fit to make any change in this supposedly unjust and confiscatory rule which may operate to "cheat" inventors of their inventions. Since *In re Weston,* the case which adopted the "mere function of an apparatus" rejection upon review of Patent Office action, some thirty-two Congresses have met and adjourned without taking any action to modify the law in that respect. On the contrary, in the Patent Act of 1952 Congress dealt specifically with the patentability of processes but did not disturb the existing decisional law upon the point here involved. Since Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545, it has been generally accepted that the Act of 1952 was in effect a codification of statutory law and judicial precedents and not intended to change the "general level of patentable inventions." Thus, the principle that a process which is merely the function of an apparatus is unpatentable, which by that time had become settled law,[1] was, by implication, adopted by Congress.

---

1. In In re Horvath, 211 F.2d 604, 41 CCPA 844, decided March 23, 1954, this court affirmed the rejection of seven claims of an application, saying " * * * we recognize the well settled law that process or method claims merely claiming the function of the apparatus are not allowable, as has been held in a long line of decisions from this court * * *."

As a matter of fact, it is highly questionable whether the rule curtails the rights of inventors to any substantial extent. Certainly it cannot be said that it perpetuates error from which grievous wrong results, or that there is any grave necessity for its repeal. And it may be pointed out that while the present rule limits the patentee's rights in one respect the law as adopted by the majority puts him in a position to exclude from any commercial exploitation every new and unobvious apparatus which may use the patented process to obtain an improved result in a more efficient manner—a consequence which, it would seem, could tend to *discourage,* rather than promote, the progress of science and useful arts. As the Government points out:

It is alleged that the rejection is inequitable. However, equity is satisfied if appellant can obtain claims which adequately protect his invention. Appellant has been allowed such claims on his apparatus. The apparatus claims provide concrete protection for appellant's invention. In the present state of the art the specific method which appellant claims can only be performed by the apparatus claimed by appellant. The only purpose served by granting appellant the specific method claims would be to discourage others from inventing a different apparatus to perform the specific method. Such discouragement is not in accord with the policy of the Patent system. In re Flint [330 F.2d 363], 51 CCPA 1230, 144 USPQ 299, states:

[I]t is advantageous to the public in the promotion of *progress of the useful arts,* the constitutional objective of the patent law, to provide inducement for the invention of devices which are the *functional* equivalents of devices already known. It is not the object of the policy behind the patent system to encourage satisfaction with or commercialization only of the first device for performing a given function that happens to come along. And for those who may be interested in promoting *competition* in the interest of the consuming public, the greater the number of *functionally* equivalent devices which are encouraged onto the market by patent protection, the better off the consumer will be.

We have, of course, no way of assessing with certainty the accuracy of the Government's theory any more than we can assess the accuracy of the majority's supposition that denying appellant his process claim will deprive him of the fruits of his invention. It serves to point up, however, that the "equities" are not weighted so heavily on one side as the majority assumes. If the Government's theory is correct, the majority's newly-charted course is contrary to the basic constitutional objective of promoting the progress of the useful arts; if that espoused by the majority is correct, the many prior decisions of this court have seemingly been causing progress in the useful arts to languish, which does not appear to have been the fact to any noticeable extent.

I think that it takes much more than the discovery of a possible flaw in the reasoning of a court of years ago, which may or may not have misunderstood the purport of earlier decisions, to overturn a well established and accepted rule of nearly seventy years' standing. It does not seem to me that the facts here justify the wholesale reversal of the settled law of this court on the abstract proposition of "equity." Rather, it should be asked "equity" for whom? The inventor here? Other inventors in this and related fields? The public?

In view of the foregoing, I feel bound to record my disagreement with the majority opinion.