A06A1726. DBL, INC. v. CARSON et al.
A06A1727. HOLCOMB v. CARSON et al.

(645 SE2d 56)

ANDREWS, Presiding Judge.

This is the second appearance of the suit involving DBL, Inc. and the members of the Carson family (plaintiffs below) in this Court. In *DBL, Inc. v. Carson*, 262 Ga. App. 252 (585 SE2d 87) (2003), we reversed the trial court's order enjoining DBL's use of docks fronting the plaintiffs'[1] property pending resolution of the plaintiffs' claims for declaratory relief, breach of contract, and trespass. We also affirmed the trial court's order denying DBL's motion to dismiss the complaint. Following remand to the trial court, the State of Georgia, through Noel Holcomb, in his capacity as Commissioner of the Department of Natural Resources (DNR) and chairman of the Coastal Marshlands Protection Committee (CMPC), was joined as a party. The trial court then granted the motion for partial summary judgment of Edwin Carson, finding that the water bottom lease to DBL of the area in front of the plaintiffs' property was illegally granted by the CMPC.[2]

DBL appeals in Case No. A06A1726 and the State appeals in Case No. A06A1727. The two appeals have been consolidated for our consideration.

Carson's motion for partial summary judgment on his claim for declaratory relief was based on his contention that, as a matter of law, "DBL is no longer eligible under the Coastal Marshlands Protection Act to have the marina [water bottoms] lease and the lease should be terminated as a matter of law."[3]

On appeal from the grant of a motion for summary judgment, we conduct a de novo review of the law and evidence, viewing the evidence in the light most favorable to the nonmovant, to determine whether a genuine issue of material fact exists and whether the moving party was entitled to judgment as a matter of law. *Holbrook v. Stansell*, 254 Ga. App. 553-554 (562 SE2d 731) (2002).

The following facts are not disputed. Since 1940, the Carson family has owned Lot 36 of the Walthour Subdivision located on the Turtle River in Chatham County. This land fronts the area of the water bottom lease between DBL and the CMPC which is at issue in this case. The Carson family operated the Carson Boat Company and

---

[1] Edwin Carson, Brenda Rotureau, Carol Bowman, and Hattie Carson.

[2] Although the remaining plaintiffs had not filed similar motions for partial summary judgment, the trial court also granted partial summary judgment to them. *Guideone Life Ins. Co. v. Ward*, 275 Ga. App. 1, 7 (3) (619 SE2d 723) (2005).

[3] Although the trial court's order refers to Count 6 as the declaratory judgment count, it appears that in the last amendment of the complaint, filed October 31, 2002, Count 3 was for declaratory judgment.

marina on the upland and on docks installed pursuant to Corps of Engineers permits and located in the water bottom lease area for a number of years. On April 22, 1972, plaintiff Edwin Carson and John A. G. Carson (whose descendants are the other plaintiffs) leased Lot 36, including the upland restaurant and lounge as well as the existing marina and docks, to Baker Yachts, Inc. This lease was amended in 1977 and, among other things, the term of the lease was extended until April 30, 1992, with an option to renew for an additional ten years, which was later exercised.

In 1985, Richard Long, through DBL, Inc., purchased the assets of Baker Yachts, Inc., which included an assignment of the Carson lease. Preparations for the 1996 Olympics resulted in additional docks being added to the marina area and these docks were later purchased by DBL.

Following discussion and vote by the CMPC in April 1995, on December 18, 1996, the water bottom lease at issue was signed by the CMPC and Long, president of Sail Harbor Marina, the trade name under which DBL operated the marina. Included in that lease as "Parcel A" was the water bottom area abutting the Carson upland, as well as some adjacent water bottom abutting property of another owner.

The 1972 lease of the Carson upland and the 1977 amendment expired on April 30, 2002, while the water bottom lease of Parcel A, as written, will not expire until the last day of February 2009, and the water bottom lease of Parcel B will not expire until December 31, 2007, although renewals of this portion of the lease are available.

Long was aware that the water bottom lease and the upland lease expired at different times and were not co-extensive. In 1995, when Long applied for the water bottom lease, he did not own any upland property contiguous to the water bottom sought to be leased. The sole basis upon which Long relied in seeking the water bottom lease was his leasehold on the Carson upland through the 1972 lease, which he argued constituted permission of the owner of the upland for his application for the water bottom lease in 1995.

The two provisions of this lease relied upon by Long are a portion of paragraph 3 and paragraph 5 of the 1972 Carson/Baker Yachts lease. The portion of paragraph 3 states:

Thereafter [after August 1, 1974] and provided Lessee has obtained all *permits* it shall be required to have from the United States Corps of Engineers with respect to dock and other facilities at or adjacent to the leased premises including the placing by Lessee of an additional row of floating docks channelward of the present floating docks, and *any and all business and other licenses required of Lessee by*

*governmental bodies*, Lessee shall pay in advance to Lessors the sum of Twelve Hundred ($1,200.00) Dollars each month. . . .

(Emphasis supplied.)

Paragraph 5 states that

> Lessee shall have the right at its expense to place additional buildings and other improvements upon the premises for its use, including the building and/or the placing of permanent or floating docks and other types of wet storage facilities for watercraft of all kinds, and to install dock piling as may, in the discretion of the Lessee, be needed for its purposes.

Upon expiration of the upland lease in 2002, DBL removed its property from Lot 36 but continued to use the docks in front of Lot 36 and to operate the marina adjacent to that lot. Since 1986, DBL has owned Lot 33, which is two lots from Lot 36. During the pendency of this action, DBL sought and obtained a ten-year lease from CMPC to the water bottoms adjacent to Lot 33. DBL constructed a dock extending from Lot 33 to the existing docks in front of Lot 36 and continued to operate the marina.

## Case No. A06A1726

1. DBL's first enumeration is that the trial court erred in concluding that the water bottom lease was issued in violation of the Coastal Marshlands Protection Act because Long was not an "eligible person" to apply for such a lease.

(a) We first address the contention of DBL that the following language in *DBL, Inc. v. Carson*, supra at 253, constitutes the law of the case: "[u]nder the Coastal Marshlands Protection Act of 1970, DBL was eligible to lease the river bottom by virtue of its leasehold in the landowners' upland property." (Footnotes omitted.)

That statement is not the law of the case because that decision reviewed the validity of an interlocutory injunction based on a preliminary evidentiary hearing and not the more complete record of the proceeding on the motion for partial summary judgment, during which additional evidence was presented. See *Sneakers of Cobb County v. Cobb County*, 265 Ga. 410 (1) (455 SE2d 834) (1995) (Grant or denial of interlocutory injunction, as well as the affirmance of it by an appellate court, does not establish the law of the case for the trial on the merits.); *McGregor v. Town of Fort Oglethorpe*, 236 Ga. 711, 713 (225 SE2d 238) (1976). DBL's attempt to distinguish *Sneakers*, supra, on the basis that it involved an affirmance by the appellate court

without opinion is unavailing. *Bishop Eddie Long Ministries, Inc. v. Dillard*, 272 Ga. App. 894, 899 (1), n. 9 (613 SE2d 673) (2005).

(b) The Coastal Marshlands Protection Act was originally enacted by Ga. L. 1970, pp. 939-949, and consisted of what is now codified as OCGA §§ 12-5-282 (with the exception of subsection 6, which was enacted in 1989 as discussed hereinafter); 12-5-284 through 12-5-286; 12-5-289; 12-5-290; 12-5-292 through 12-5-296.[4]

OCGA § 12-5-286 provides:

> (a) No person shall remove, fill, dredge, drain, or otherwise alter any marshlands or construct or locate any structure on or over marshlands in this state within the estuarine area thereof without first obtaining a permit from the committee or, in the case of minor alteration of marshlands, the commissioner. A permit may authorize the construction or maintenance of the project proposed in an application. After construction pursuant to a permit, a project may be maintained without a permit so long as it does not further alter the natural topography or vegetation at the project site.

> (b) Each application for such permit ... shall include: ...

> (4) *A copy of the deed or other instrument under which the applicant claims title to the property or, if the applicant is not the owner, then a copy of the deed or other instrument under which the owner claims title together with written permission from the owner to carry out the project on his land.* In lieu of a deed or other instrument referred to in this paragraph, the committee may accept some other reasonable evidence of *ownership of the property in question or other lawful authority to make use of the property.* The committee will not adjudicate title disputes concerning the property which is the subject of the application; provided, however, that the committee may decline to process an application when submitted documents show conflicting deeds;

> (5) A list of all *adjoining landowners* together with such owners' addresses, provided that if the names or addresses of adjoining landowners cannot be determined, the applicant shall file in lieu thereof a sworn affidavit that a diligent

---

[4] In 1972, the CMPC was established to issue all permits and leases and to enforce the provisions of the Act. OCGA §§ 12-5-283; 12-5-291.

search, including, without limitation, a search of the records of the county tax assessor's office, has been made but that the applicant was not able to ascertain the names or addresses, as the case may be, of adjoining landowners.

(Emphasis supplied.)

A permit issued under these provisions could continue in force if the permit holder sold, leased, rented or otherwise conveyed the land or any portion thereof for which the permit had been issued, if the DNR had been notified within 30 days of the transfer or conveyance and no change was made in the use of the land. OCGA § 12-5-293.

OCGA § 12-5-287, enacted in 1989, provides, in pertinent part:

(a) The committee, acting for and on behalf of and in the name of the state, is further authorized and empowered to grant and convey to *any eligible person* a lease of state owned marshland or water bottoms, or a combination thereof, upon such terms and conditions as the committee deems advisable for the purpose of constructing, operating, and maintaining thereupon a *marina or marinas or dock* providing more than 500 linear feet of dock space, including the installing, maintaining, repairing, removing, and replacing of buildings, structures, piers, docks, floating docks, marine railways, dolphins, pilings, appurtenances thereto, and all facilities and improvements that shall be reasonably used for or in connection therewith, subject always to the initial and continuing compliance by the lessee with all applicable laws pertaining to the use of the leased property and subject always to the use and enjoyment of the public of any navigable waters upon or over the leased property.

(Emphasis supplied.)

The following definition of "eligible person" was added in 1989 as subsection (6) of OCGA § 12-5-282:

"Eligible person" means any person who is the *owner of high land adjoining the state owned marshland or water bottoms,* or combination thereof, sought to be leased by said person such that *at least 100 percent of the landward boundary of the state owned marshland or water bottom, or combination thereof, sought to be leased is bordered by said adjoining high land.*

(Emphasis supplied.)

As originally enacted in 1989, OCGA § 12-5-287 (c) required that the application for a marshland or water bottom lease

> shall include a legal description of the boundaries of the area sought to be leased; a plat of survey of the acreage sought to be leased . . . ; *documentation of ownership of the adjoining high land upon which the applicant bases his claim of eligibility*, which documentation shall include copies of all relevant deeds and plats of such high land; and a list of all owners of marshland and high land adjoining *the applicant's high land.*

(Emphasis supplied.) Ga. L. 1989, pp. 574, 576.

In 1995, OCGA § 12-5-287 (c) was amended by deleting the above quoted 1989 provision and inserting "[s]uch application shall include all of the information required for a permit under this part." This information is specified in OCGA § 12-5-286 (b) (4), quoted above.

Lessees of marshland and water bottoms entered into after the 1989 enactment were required to pay to the State the fair market rental value of the marshland or water bottom. OCGA § 12-5-287 (d). A grandfather provision was included for those already operating a marina in 1989. OCGA § 12-5-287 (g). It stated:

> (g) Upon application of any *eligible person* who . . . is the *owner of a marina in existence on March 1, 1989,* . . . the committee *shall grant to that eligible person a lease of the state owned marshland or water bottoms upon which such marina is actually located for a term of 20 years beginning March 1, 1989*, with a nominal rental of $1.00 per year; provided, however, that any extensions of the dock space or expansion of the area of state owned marshland or water bottoms actually used in conjunction with the marina shall be subject to the provisions of subsection (d) of this Code section; and provided, further, that any such application made on or after January 1, 1999, shall be subject to the provisions of subsection (d) of this Code section.

(Emphasis supplied.)

(c) In construing statutes, all words are to be given their "ordinary signification." OCGA § 1-3-1 (b). " 'It is a well-established principle that a statute must be viewed so as to make all its parts harmonize and to give a sensible and intelligent effect to each part.' [Cit.]" *Vollrath v. Collins*, 272 Ga. 601, 603-604 (2) (533 SE2d 57) (2000).

So viewing these statutes, we agree with the trial court that there are two components of eligibility under OCGA § 12-5-282 (6) for a marshland/water bottom lease: (1) the ownership interest in the high land (or upland) and (2) the metes and bounds of the high land contiguous to the water bottom so that at least 100 percent of the landward boundary of the state owned water bottom is bordered by this adjoining high land.

The issue here is whether, as argued by DBL, the 1972 lease, as amended in 1977, provides the required "written permission from the owner to carry out the project on his land" to satisfy the ownership interest component of eligibility. OCGA § 12-5-286 (b) (4).

We agree with the trial court that having a lease on the upland property can satisfy the "ownership" component of being an "eligible person." We base our conclusion on the 1995 change in OCGA § 12-5-287 (c), as set out above. This change indicates the legislature's intention not to require fee simple ownership of the upland adjacent to the water bottom, evidenced by deeds, as the 1989 act originally required, but to allow the applicant to come forward with the upland owner's deed *and* proof that the applicant had "written permission from the owner to carry out the project on his land." OCGA § 12-5-286 (b) (4).

Construing the language in the lease and its amendment is governed by the rules of contract construction. *Irvin v. Laxmi, Inc.*, 266 Ga. 204, 205 (467 SE2d 510) (1996). Generally, this presents a question of law for the court, unless the language presents an ambiguity that cannot be resolved by the rules of construction. *Imerys Marble Co. v. J. M. Huber Corp.*, 276 Ga. 401, 403 (577 SE2d 555) (2003); *Hardman v. Dahlonega-Lumpkin County Chamber of Commerce*, 238 Ga. 551, 553 (233 SE2d 753) (1977). The cardinal rule of construction is to ascertain the intent of the parties. *Irvin*, 266 Ga. at 205. "Where the contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties. [Cit.]" *Southern Fed. S & L Assn. &c. v. Lyle*, 249 Ga. 284, 287 (290 SE2d 455) (1982). See also *Park 'N Go of Ga. v. U. S. Fidelity &c. Co.*, 266 Ga. 787, 791 (471 SE2d 500) (1996). To determine the intent of the parties, all the contract terms must be considered together in arriving at the construction of any part, and a construction upholding the contract in whole and every part is preferred. *Cole v. Thrasher*, 246 Ga. 683, 684 (272 SE2d 696) (1980); *McCann v. Glynn Lumber Co.*, 199 Ga. 669, 674 (34 SE2d 839) (1945). "[W]hen the language employed by the parties in their contract is plain, unambiguous, and capable of only one reasonable interpretation . . . the language used must be afforded its literal meaning and plain ordinary words given their usual significance. . . . [Cits.]" *Wolverine Ins. Co. v. Jack Jordan, Inc.*, 213 Ga. 299, 302 (99 SE2d 95) (1957).

So construing the lease and amendment, we agree with the trial court that, while the lease did grant the right to seek *permits* from the Corps of Engineers for the construction of docks and other facilities and the right to seek the necessary business and other *licenses* for conducting the business of a marina,[5] the upland lease cannot be construed as a written assignment of rights to the water bottoms adjacent to the upland nor as permission to apply for the lease of the water bottom from the CMPC either during or beyond the duration of the upland lease. As noted by the trial court,

> [i]t cannot be seriously argued that by authorizing the construction by Baker Yachts of floating and permanent docks back in 1972, that Carson intended to permit contin-ued operation of the marina or to assign his rights to the water bottoms — pursuant to a law not even in existence until 1989 — for a time period beyond the expiration of the upland lease.

We also conclude that the same rationale precludes construing the lease language as permission from the plaintiffs to apply for a water bottom lease during the term of the lease.

This reasoning is also supported by the fact that the legislation creating the CMPC was only enacted in April 1972, the same month that the Carson/Baker Yachts lease was signed. Ga. L. 1972, pp. 1015, 1027, 1068, § 17 (b). It is inconceivable that the parties to the lease would have anticipated that this committee would, 17 years later, be empowered to lease marshlands and water bottoms.

There was no error in the trial court's determination that the lease did not provide the required written permission of the upland owner for the leasing of the adjacent water bottom.

2. In its second enumeration, DBL contends that the trial court erred in finding plaintiffs had a right to pursue a declaratory judg-ment action and that such action was not barred by their failure to exhaust administrative remedies.

First, as acknowledged by the attorney for the DNR who testified at the hearing, only the owners of property adjacent to Lot 36 were given notice of DBL's application for the water bottom lease in 1995, and there is nothing showing actual notice to any of the plaintiffs contained in the CMPC files.

---

[5] See *Inter-City Coach Lines v. Harrison,* 172 Ga. 390, 395-396 (157 SE 673) (1931) (Object of a "license" is to confer a right or power which does not exist without it and to regulate and control the occupation for which the license is granted.).

[While] it is generally true that a party must exhaust administrative remedies before appealing to superior court[,] OCGA § 50-13-19 (a)[,] . . . the mere existence of an unexhausted administrative remedy does not, standing alone, afford a defendant an absolute defense to a legal action. *City of Waycross v. Reid Rental Co.*, 186 Ga. App. 452, 454 (367 SE2d 305) (1988). For instance, exhaustion is not required where the defect urged goes to the power of the agency to issue the order. Id.

*AT&T Wireless PCS v. Leafmore Forest Condo Assn. &c.*, 235 Ga. App. 319, 321-322 (2) (509 SE2d 374) (1998).

Since plaintiffs' challenge here was to the authority of the CMPC to issue a water bottom lease with a term in excess of the upland lease term without the permission of the upland owner, plaintiffs were not required to exhaust administrative remedies. *AT&T Wireless PCS v. Leafmore Forest Condo. Assn. &c.*, supra.

3. DBL's third enumeration (the trial court erred in concluding the decision to grant and convey the water bottom lease was made in April 1995), and fifth enumeration of error (the trial court erred in attaching Exhibit A (a plat of the marina upon which the trial court had made markings)) are without merit.

4. DBL's final enumeration of error is that the trial court erred in concluding that the plaintiffs' action was not barred by laches.

It is a longstanding and well-established rule that the doctrine of laches is an equitable defense which is not applicable to actions at law, which include declaratory judgment actions. See, e.g., *Stuckey v. Storms*, 265 Ga. 491 (1) (458 SE2d 344) (1995); *Jones v. Douglas County*, 262 Ga. 317 (1) (a) (418 SE2d 19) (1992). This continues to be a valid statement of the law.

*VATACS Group v. Homeside Lending*, 281 Ga. 50 (635 SE2d 758) (2006).

### Case No. A06A1727

5. To the extent that the two enumerations of Commissioner Holcomb are identical to Enumerations 1 and 2 of DBL, they are controlled by our findings in Divisions 1 and 2 of Case No. A06A1726.

6. The argument made here by Commissioner Holcomb that any marina operator is an "eligible person" under OCGA § 12-5-287, without reference to the relationship of this person or entity to the upland abutting the water bottom sought to be leased, was not made

below and will not be considered here for the first time. *Guin v. Alarm Detection Indus.*, 278 Ga. App. 114, 117 (2) (628 SE2d 376) (2006). "[T]his court is for the correction of errors, and where the trial court has not ruled on an issue, we will not address it." (Citation and punctuation omitted.) *Municipal Elec. Auth. of Ga. v. Gold-Arrow Farms*, 276 Ga. App. 862, 870 (3) (625 SE2d 57) (2005).

*Judgment affirmed. Barnes, C. J., and Bernes, J., concur.*

DECIDED MARCH 26, 2007 —
RECONSIDERATIONS DENIED APRIL 12, 2007 — 

*H. Lehman Franklin, Jr.*, for appellant (case no. A06A1726).

*Thurbert E. Baker, Attorney General, Isaac Byrd, Deputy Attorney General, John E. Hennelly, James D. Coots, Assistant Attorneys General*, for appellant (case no. A06A1727).

*Duffy & Feemster, Dwight T. Feemster, Ellis, Painter, Ratterree & Adams, Tracy A. O'Connell, Edward L. Newberry, Jr., David H. Fritts*, for appellees.