A10A2167. GEORGIA SOCIETY OF AMBULATORY SURGERY CENTERS v. GEORGIA DEPARTMENT OF COMMUNITY HEALTH et al.
(710 SE2d 183)

BARNES, Presiding Judge.

This case arises out of a complaint for a declaratory judgment and injunctive relief filed by the Georgia Society of Ambulatory Surgery Centers ("GSASC") against the Georgia Department of Community Health and its Commissioner (collectively, "DCH"). GSASC contended that a 2009 annual survey issued by DCH to ambulatory surgery centers sought information beyond the scope of OCGA § 31-6-70, and requested an interlocutory injunction to prevent its members from having to provide the information during the pendency of the litigation. The trial court denied GSASC's request for an interlocutory injunction on the ground that the information requested in the survey was authorized under Georgia law.[1] GSASC now appeals the trial court's denial of its request for interlocutory injunctive relief. Because the survey sought information beyond what was permitted under OCGA § 31-6-70, we reverse.

*GSASC and Its Members.* The relevant facts are undisputed. GSASC is an organization whose members own and operate licensed ambulatory surgery centers throughout Georgia. An ambulatory surgery center ("ASC") is "a public or private facility, not a part of a hospital, which provides surgical or obstetrical treatment performed under general or regional anesthesia in an operating room

---

[35] See generally *Landers v. State*, 270 Ga. 189, 191 (4) (508 SE2d 637) (1998).

[1] The trial court also temporarily enjoined any enforcement actions by DCH against the ambulatory surgery centers for failure to provide the requested survey information during the pendency of this appeal.

environment to patients not requiring hospitalization." OCGA § 31-6-2 (1). GSASC's members are primarily physician-owned ASCs that offer outpatient surgery in a single medical specialty, such as orthopedics, ophthalmology, or urology.

*The Certificate of Need Program.* DCH is the "lead planning agency for all health issues" in Georgia. OCGA § 31-2-1 (1). The heart of DCH's health planning duties is contained in the "certificate of need" ("CON") program codified at OCGA § 31-6-40 et seq. The CON program was adopted "to create a system for planning new health service institutions to avoid costly duplication of services where insufficient need existed." *Albany Surgical v. Dept. of Community Health*, 257 Ga. App. 636 (572 SE2d 638) (2002). Under the program, those wishing to provide institutional health services must obtain a CON from DCH. OCGA § 31-6-40 (a). A CON is "an official determination by [DCH], evidenced by certification issued pursuant to an application, that the action proposed in the application satisfies and complies with the criteria [of the CON program] and rules promulgated pursuant [thereto]." OCGA § 31-6-2 (6).

Certain healthcare providers are exempt from the CON program. OCGA § 31-6-47 (a). These exemptions include single-specialty ASCs. OCGA § 31-6-47 (a) (18). ASCs must document their exemption from the CON program by obtaining a "letter of non-reviewability" ("LNR") from DCH. OCGA § 31-6-47.1; Ga. Comp. R. & Regs. r. 111-2-2-.10. A majority of GSASC's members operate pursuant to LNRs rather than CONs.

*The Annual Reporting Requirement.* One of DCH's duties in administering the CON program is to collect data for health planning purposes through annual reports submitted by healthcare providers. See OCGA §§ 31-6-21 (b) (5); 31-6-70 (a). To effectuate this duty, DCH each year prepares an annual survey that must be filled out by healthcare providers for the prior year. See OCGA § 31-6-70 (a); Ga. Comp. R. & Regs. r. 111-2-2-.04.

Based upon 2008 amendments to the CON program, ASCs operating under LNRs are now required to provide the same information to DCH annually as healthcare facilities operating under CONs. See OCGA § 31-6-40 (c) (2) (B); Ga. L. 2008, p. 12, § 1-1. Specifically, under OCGA § 31-6-70 as amended, ASCs operating under LNRs must now respond to the annual survey issued by DCH requesting information about their operations. See OCGA § 31-6-70 (a). If an ASC fails to submit a survey that is both complete and timely, DCH can impose a fine of up to $500 a day for the first 30 days of noncompliance and $1,000 a day thereafter. OCGA § 31-6-70 (e) (1); Ga. Comp. R. & Regs. r. 111-2-2-.04 (1) (c). For repeated failures to provide the information requested in a survey, an ASC also is subject to possible revocation of its exemption from the CON

program. OCGA § 31-6-47 (a) (18).

*The 2009 Annual Survey.* In early 2010, DCH issued its 2009 annual survey for single-specialty, physician-owned ASCs. Among other things, the survey requested that all ASCs reveal the following information: (1) the number of rooms, procedures, and patients surgically treated by the ASC; (2) the number of patients that were admitted to a hospital before the completion of or immediately following surgery; (3) the race and ethnicity of all patients; (4) the gender of all patients; (5) the top ten procedures performed by the ASC, broken down by CPT code, procedure name, number of procedures, and average charge; (6) the number of patients and procedures by payer source (such as Medicare, Medicaid, self-pay, etc.); (7) total expenses; and (8) the origin of all patients by county (collectively, "the Disputed Requests"). The instructions for the survey stated: "Providing false or inaccurate information may result in adverse regulatory action pursuant to DCH Rules 111-2-2-.04 (1) (b), 111-2-2-.05 (1) (a) (1), and 111-2-2-.05 (1) (a) (7), other regulations and statutes, and may constitute a crime under OCGA §§ 16-10-20 and 16-14-1."[2] Responses to the survey were due by March 12, 2010.

*The Instant Lawsuit.* On March 4, 2010, GSASC filed the instant lawsuit seeking a declaration that the Disputed Requests went beyond the scope of what DCH could seek in an annual survey under OCGA § 31-6-70.[3] GSASC also sought interlocutory and permanent injunctive relief preventing DCH from requiring its members to respond to the Disputed Requests. On March 9, 2010, GSASC filed its request for an interlocutory injunction, and two days later the trial court conducted a hearing on the matter. Following the hearing, the trial court denied GSASC's request for an interlocutory injunction based upon its conclusion that DCH was "authorized to request the information at issue under applicable law." This appeal followed.

1. "Generally, the trial court has broad discretion to decide whether to grant or deny an interlocutory injunction. OCGA § 9-5-8." *Madonna v. Satilla Health Svcs.*, 290 Ga. App. 148, 150 (658 SE2d 858) (2008). But a trial court abuses its discretion in granting or denying injunctive relief if its ruling is based on an erroneous interpretation of the law. Id. We conclude that the trial court abused its discretion in the present case because its decision to deny

---

[2] OCGA § 16-10-20 provides criminal penalties for a person who knowingly and willfully makes false statements to, or conceals material facts from, a government department or agency. Georgia's Racketeer Influenced and Corrupt Organizations Act is codified at OCGA § 16-14-1 et seq.

[3] GSASC did not challenge the contents of the 2009 annual survey beyond the Disputed Requests.

interlocutory injunctive relief to GSASC was based on the erroneous legal conclusion that the Disputed Requests were statutorily authorized.

"The test of the validity of an administrative rule is twofold: whether it is authorized by statute and whether it is reasonable." (Citation and punctuation omitted.) *Dept. of Human Resources v. Anderson*, 218 Ga. App. 528, 529 (462 SE2d 439) (1995). In applying this test, we have explained that "the interpretation of a statute by an administrative agency which has the duty of enforcing or administering it is to be given great weight and deference." (Citation and punctuation omitted.) *Dept. of Community Health v. Gwinnett Hosp. System*, 262 Ga. App. 879, 882 (586 SE2d 762) (2003). "However, an administrative rule which exceeds the scope of or is inconsistent with the authority of the statute upon which it is predicated is invalid." *Anderson*, 218 Ga. App. at 529. See also *North Fulton Medical Center v. Stephenson*, 269 Ga. 540, 543 (1) (501 SE2d 798) (1998); *Albany Surgical*, 257 Ga. App. at 638 (1) (a). Mindful of these principles, we turn to the statute at issue here.

As previously noted, DCH's authority to request information from ASCs in an annual survey is found in OCGA § 31-6-70. That statute provides in relevant part:

> (a) There shall be required from each health care facility in this state requiring a certificate of need and all ambulatory surgical centers and imaging centers, whether or not exempt from obtaining a certificate of need under this chapter, an annual report of certain health care information to be submitted to the department. . . .
>
> (b) The report required under subsection (a) of this Code section shall contain the following information:
>
> > (1) Total gross revenues;
> >
> > (2) Bad debts;
> >
> > (3) Amounts of free care extended, excluding bad debts;
> >
> > (4) Contractual adjustments;
> >
> > (5) Amounts of care provided under a Hill-Burton commitment;
> >
> > (6) Amounts of charity care provided to indigent persons;
> >
> > (7) Amounts of outside sources of funding from governmental entities, philanthropic groups, or any other source, including the proportion of any such funding dedicated to the care of indigent persons; and

(8) For cases involving indigent persons:

(A) The number of persons treated;

(B) The number of inpatients and outpatients;

(C) Total patient days;

(D) The number of patients categorized by county of residence; and

(E) The indigent care costs incurred by the health care facility by county of residence.

(c) As used in subsection (b) of this Code section, "indigent persons" means persons having as a maximum allowable income level an amount corresponding to 125 percent of the federal poverty guideline.

(d) The department shall provide a form for the report required by subsection (a) of this Code section and may provide in said form for further categorical divisions of the information listed in subsection (b) of this Code section.

OCGA § 31-6-70 (a)-(d).

GSASC contends that the Disputed Requests exceeded the scope of information that DCH was authorized to obtain under OCGA § 31-6-70 (b) and (d). In this regard, GSASC emphasizes that the Disputed Requests did not limit any of the types of information being sought to "indigent persons" as defined by OCGA § 31-6-70 (c), and thus could not be reasonably construed as seeking information that fell within OCGA § 31-6-70 (b) (8). GSASC further maintains that none of the disputed information could reasonably be construed as falling within OCGA § 31-6-70 (b) (1)-(7), the statutory subsections applicable to nonindigent persons.

It is a cardinal rule of statutory construction that "the literal meaning of the statute prevails unless such a construction would produce unreasonable or absurd consequences not contemplated by the legislature." *Johnson v. State*, 267 Ga. 77, 78 (475 SE2d 595) (1996). "Moreover, in construing language in any one part of a statute, a court should consider the entire scheme of the statute and attempt to gather the legislative intent from the statute as a whole." (Citation and punctuation omitted.) *Beacon Medical Products v. Travelers Cas. &c. of America*, 292 Ga. App. 617, 619 (665 SE2d 710) (2008). Statutes also should be construed in a manner that gives all of the words meaning. See OCGA § 1-3-1 (b); *Porter v. Food Giant*, 198 Ga. App. 736, 738 (1) (402 SE2d 766) (1991) ("It is contrary to the generally accepted principles for construing statutes to 'read out' any part of the statute as 'mere surplusage' unless there is a clear reason for doing so.").

36

Applying these principles to the case at hand, we agree with GSASC that the Disputed Requests were overly broad and sought information beyond what was statutorily permitted. By its plain and literal terms, OCGA § 31-6-70 (b) contains a detailed list of information that ASCs must annually report to DCH. OCGA § 31-6-70 (d) then authorizes DCH to request in its annual survey "further categorical divisions of the information listed in subsection (b)," but it does not allow DCH to go beyond those categories and add additional ones. For example, DCH could request more specific information from ASCs about the "[a]mounts of free care extended, excluding bad debts," see OCGA § 31-6-70 (b) (3), such as by requiring providers to break down the amount of free care by type of procedure. What DCH cannot do, and what it clearly attempted to do in the Disputed Requests, is request information from ASCs that fell completely outside the specific categories set forth in OCGA § 31-6-70 (b) (1)-(8).

Nevertheless, DCH argues that it is generally empowered to request information from ASCs under OCGA § 31-6-21 (b) (5), which states: "The functions of the department shall be[ ] . . . [t]o define, by rule, the form, content, schedules, and procedures for submission of applications for certificates of need and periodic reports." But it is axiomatic that the terms of a specific statute govern over those of a more general statute, see *Glinton v. And R, Inc.*, 271 Ga. 864, 867 (524 SE2d 481) (1999), and thus the more specific provisions of OCGA § 31-6-70 (b) and (d) control over the more general provisions of OCGA § 31-6-21 (b) (5). Furthermore, if OCGA § 31-6-21 (b) (5) were construed as granting DCH unbridled authority to require ASCs to produce any information it wished through an annual survey, the restrictions imposed on DCH's authority by OCGA § 31-6-70 (d) would be meaningless.

DCH also points to OCGA § 31-6-21 (b) (8) as a source of general authority to request information from ASCs. That subsection provides in relevant part:

> The functions of the department shall be . . . [t]o establish, by rule, need methodologies for new institutional health services and health facilities. In developing such need methodologies, the department shall, at a minimum, consider the demographic characteristics of the population, the health status of the population, service use patterns, standards and trends, financial and geographic accessibility, and market economics. . . .

OCGA § 31-6-21 (b) (8). By its plain and literal terms, OCGA § 31-6-21 (b) (8) discusses DCH's responsibility to develop certificate of need

methodologies; it is silent as to the authority of DCH to request information from ASCs or other institutions. That authority instead is delineated expressly in OCGA § 31-6-70. When read in conjunction with OCGA § 31-6-70, the provisions of OCGA § 31-6-21 (b) (8) cannot be construed as endowing DCH with general authority to request any information it chooses from ASCs through its annual survey.

Additionally, while DCH cites to its own administrative rules and regulations to support its contention that it had general authority to seek information from ASCs, "an administrative rule which exceeds the scope of or is inconsistent with the authority of the statute upon which it is predicated is invalid." *Anderson*, 218 Ga. App. at 529. Thus, DCH's rules and regulations could not empower it to issue an annual survey seeking information beyond what was authorized in OCGA § 31-6-70.

For these reasons, the trial court erred by concluding that DCH had statutory authority to include the Disputed Requests in the 2009 annual survey issued to ASCs. Accordingly, the trial court's denial of GSASC's request for an interlocutory injunction was based on an erroneous interpretation of the law and must be reversed.

2. DCH argues that we should affirm the trial court's denial of GSASC's request for an interlocutory injunction on the alternative basis that GSASC failed to exhaust its administrative remedies. DCH notes that if an ASC is fined, sanctioned, or has its exemption status revoked for failure to fully respond to an annual survey, the ASC is entitled to notice and an administrative hearing under the Georgia Administrative Procedure Act, OCGA § 50-13-1 et seq., before any such fine or sanction is exacted. See OCGA §§ 31-6-40 (c) (2); 31-6-47 (a) (18). After an administrative hearing, the ASC may appeal to the Commissioner of DCH, and then petition for judicial review. See OCGA § 50-13-19; Ga. Comp. R. & Regs. r. 111-2-2-.05 (2) (e). According to DCH, these procedures provide an adequate administrative remedy such that the trial court lacked subject matter jurisdiction in this case. We are unpersuaded.

It is true that "[l]ong-standing Georgia law requires that a party aggrieved by a state agency's decision must raise all issues before that agency and exhaust available administrative remedies before seeking any judicial review of the agency's decision." *Cerulean Co. v. Tiller*, 271 Ga. 65, 66 (1) (516 SE2d 522) (1999). But exhaustion of administrative remedies is not required where resorting to the remedy would be futile. See *Hall v. Nelson*, 282 Ga. 441, 443 (3) (651 SE2d 72) (2007); *Powell v. City of Snellville*, 266 Ga. 315, 316 (467 SE2d 540) (1996). Nor is exhaustion required where an agency's power to act is challenged in a declaratory judgment action. See *City of Atlanta v. Hotels.com, LP*, 285 Ga. 231, 233-234 (674 SE2d 898) (2009).

(a) *Futility.* Our Supreme Court applied the futility exception in

*Glynn County Bd. of Ed. v. Lane*, 261 Ga. 544, 545-546 (1) (407 SE2d 754) (1991), a case materially similar to the present one. In *Lane*, the issue was whether the conduct of a county board of education was inconsistent with the plain and unambiguous language of a general statute and local act, and the case turned purely on a question of statutory construction rather than on any factual matters. Id. at 544-545, 546 (2), (3). The county board argued that before pursuing a mandamus action in superior court, the appellees were required to seek relief through an administrative hearing before the board. Id. at 545 (1). Our Supreme Court disagreed: "The sole issue in this case involves conduct of the [county board]. It is unreasonable to require of appellees the futile act of participating in a hearing before that body on the question of its own conduct." Id. at 546 (1). Accordingly, our Supreme Court concluded that the appellees were entitled to pursue an action before the superior court without exhausting administrative remedies. Id. See also 7 Ga. Procedure: Special Remedies and Proceedings § 6:28 (exhaustion not required "where it is unreasonable to expect that resort to the alternative remedy would serve any useful purpose in view of the conduct of the person or persons responsible for providing the alternative relief").

The instant case is controlled by *Lane*. Here, the issue is whether DCH had statutory authority to include the Disputed Requests in the 2009 annual survey issued to ASCs; as in *Lane*, the sole issue is whether an administrative agency's conduct was inconsistent with plain and unambiguous statutory language, and the case turns purely on a question of statutory construction rather than on factual matters. DCH and its Commissioner have repeatedly made clear their position that the agency had statutory authorization to request the disputed information and would now have to abandon that position, and thus conclude that the agency's conduct was illegal, for ASCs to prevail before the agency. This, to say the least, seems highly implausible. Similar to *Lane*, it would serve no purpose, and would only lead to a repeat of the present litigation after further delay and cost, if ASCs were required to participate in an administrative hearing "before [DCH] on the question of its own conduct." 261 Ga. at 546 (1). Consequently, GSASC and its members were not required to exhaust administrative remedies because doing so would be a futile and useless act under the reasoning of our Supreme Court's decision in *Lane*.

The dissent argues that *Lane* is distinguishable because ASCs are entitled to a hearing before an administrative law judge ("ALJ"), which is then appealable to the Commissioner of DCH, and "nothing in the record suggests that the ALJ that might be assigned to hear the matter or the Commissioner personally has prejudged the issue." But the Commissioner of the DCH is named as a party in this case,

joined DCH's brief in opposition to GSASC's request for an interlocutory injunction filed in the trial court, and joined DCH's brief filed in this appeal. It follows that the positions asserted by DCH in this litigation are also asserted by its Commissioner.[4] Furthermore, on appeal from the initial decision of an ALJ, the Commissioner "shall have all the powers [she] would have in making the initial decision[.]" OCGA § 50-13-17 (a). Hence, the Commissioner would owe no deference to the ALJ's initial decision regarding the statutory interpretation questions at issue here.

(b) *Agency's Power to Act.* In *Hotels.com,* our Supreme Court explained that administrative exhaustion is not required where the plaintiff brings a declaratory judgment action challenging the agency's authority or power to act:

> This Court has recognized that the exhaustion doctrine "does not apply where the defect urged by the complaining party goes to the jurisdiction or power of the [involved] agency . . . . [Cits.]" *Cravey v. Southeastern Underwriters Assn.,* 214 Ga. 450, 457 (3) (105 SE2d 497) (1958). See generally *City of Waycross v. Reid Rental Co.,* 186 Ga. App. 452, 454 (367 SE2d 305) (1988) (adopting rationale in *Cravey,* supra, in sustaining claim for declaratory judgment). The Court of Appeals has likewise recognized that a failure to exhaust administrative remedies does not preclude a declaratory ruling to determine a party's authority to act. See *DBL, Inc. v. Carson,* 284 Ga. App. 898 (2) (645 SE2d 56) (2007) (declaratory judgment properly granted despite failure to exhaust administrative remedies where claimant challenged commission's authority to issue water bottom lease); *AT&T Wireless PCS v. Leafmore Forest Condominium Assn.,* 235 Ga. App. 319 (2) (509 SE2d 374) (1998) (declaratory judgment properly granted despite failure to exhaust administrative remedies where claimant challenged department's authority to issue building permit).

---

[4] After conducting independent online research, the dissent notes that a new Commissioner has recently been appointed to DCH and speculates that he might at some point adopt a different position than that consistently asserted by the Commissioner and DCH throughout this litigation. Any change in the Commissioner at the DCH is not a part of the record, and neither party has asked this court to take judicial notice of any change in this respect. Furthermore, the new Commissioner has not moved to withdraw as an appellee to this appeal; has not filed a supplemental brief asserting a new position; has not moved to have this case remanded due to a change in position adopted by the Commissioner; and has not otherwise indicated that he is now taking a position contrary to that maintained throughout the trial and appellate proceedings in this case.

*Hotels.com, LP*, 285 Ga. at 233-234. Here, GSASC brought a declaratory judgment action challenging DCH's authority and power to issue the Disputed Requests to ASCs. Consequently, GSASC was not required to exhaust administrative remedies under *Hotels.com* and the line of authority discussed in that decision.

*Judgment reversed. Smith, P. J., Mikell and Adams, JJ., concur. Andrews, Blackwell and Dillard, JJ., dissent.*

BLACKWELL, Judge, dissenting.

In this case, the Georgia Society of Ambulatory Surgery Centers represents the interests of members that appear to have adequate administrative remedies, and it is undisputed that these members have not exhausted their administrative remedies. Consequently, I conclude that both this Court and the trial court lack jurisdiction of the subject matter, and for this reason, we ought to dismiss this appeal and remand with instructions to dismiss the case below. Because the majority instead proceeds to address the merits, I dissent.

As our Supreme Court has explained,

Georgia law requires that a party aggrieved by a state agency's decision must raise all issues before that agency and exhaust available administrative remedies before seeking any judicial review of the agency's decision. As long as there is an effective and available administrative remedy, a party is required to pursue that remedy before seeking equitable relief in the superior court.

*Cerulean Companies v. Tiller*, 271 Ga. 65, 66 (1) (516 SE2d 522) (1999). This requirement respects the constitutional prerogatives of the executive branch and its agencies, permits an agency to apply its expertise to the resolution of disputes, promotes a more efficient resolution of disputes, and encourages the uniform and consistent resolution of disputes of a similar nature. See id. at 67 (1). When a person aggrieved by agency action has adequate administrative remedies, but files a lawsuit before exhausting his administrative remedies, the courts cannot entertain the suit. See *Northeast Georgia Cancer Care v. Blue Cross & Blue Shield of Georgia*, 297 Ga. App. 28, 32 (1) (676 SE2d 428) (2009); see also *Cerulean Companies*, 271 Ga. at 68-69 (2). "When an adequate administrative remedy exists that has not been taken, dismissal of any declaratory judgment or equitable action is appropriate." *USA Payday Cash Advance Centers v. Oxendine*, 262 Ga. App. 632, 635 (585 SE2d 924) (2003).

Citing *City of Atlanta v. Hotels.com*, 285 Ga. 231 (674 SE2d 898) (2009), the majority says that the exhaustion requirement does not

apply at all in this case because the Society challenges the power of the Department of Community Health, not merely the way in which it has exercised its power. I agree that a lawsuit asserting that an administrative agency is without any power to do what it has done usually does not require the exhaustion of administrative remedies, see 285 Ga. at 233, but I do not think this is such a case. The Department clearly has statutory authority to collect information about "the demographic characteristics of the population, the health status of the population, service use patterns, standards and trends, financial and geographic accessibility, and market economics," OCGA § 31-6-21 (b) (8), to require ambulatory surgery centers to submit annual reports, OCGA § 31-6-70 (a), and to penalize ambulatory surgery centers that fail to do so. OCGA § 31-6-47 (a) (18), (19). The dispute in this case involves whether the Department properly exercised these powers when it issued its 2009 survey of ambulatory surgery centers, which contains requests for information that is not specifically identified in OCGA § 31-6-70 (b). I think this case, therefore, is more properly characterized as a challenge to the way in which the Department has exercised its authority, not the scope of its authority.[5]

I turn now to the adequacy of the administrative remedies available to the Society and its members. The Society is bothered, of course, not so much by the fact that the Department has asked certain questions of its members, but instead by the prospect that the Department might penalize them—by imposing fines or by revoking their exemptions from certificate of need requirements[6]—if they fail to answer these specific questions. At this time, no such sanctions have been imposed against any member. But if the Department were to seek to impose such sanctions, the members against whom sanctions were sought would be entitled to notice, a hearing before an administrative law judge ("ALJ") pursuant to the Administrative Procedure Act, an opportunity to appeal the decision of the

---

[5] I do not think the majority's characterization of this case is an unreasonable one, but I think mine is more accurate and faithful to the separation of powers that the exhaustion requirement is meant to safeguard. I readily admit, however, that properly characterizing a dispute like this one–determining whether it involves a challenge to the scope of power or a mere challenge to the exercise of power–is something about which reasonable people of good faith can disagree. Some disputes clearly should be characterized as one or the other, but in most disputes, like this one, a fair case can be made for characterizing the dispute in either way, and the question ultimately comes down to a matter of semantics.

[6] The Society also claims that its members might be prosecuted for violations of the criminal law if they give false answers to these questions. But no one contends that the members of the Society have a right to give false information to the Department; the Society merely contends that its members have a right to give no information at all in response to these questions. So, I do not think the threat of criminal prosecution for giving false information has any bearing upon the effectiveness of administrative remedies in this case.

ALJ to the Commissioner of the Department, and an opportunity to seek judicial review of the decision of the Commissioner. See OCGA §§ 31-6-40 (b) (2), 31-6-47 (a) (18); DCH Rules 111-2-2-.05, 111-2-2-.10. Because these proceedings are available to the members of the Society prior to the Department taking any final, adverse action against them for failing to provide the information requested by the Department, these administrative remedies appear adequate.[7]

The majority does not dispute that these administrative remedies are facially adequate, but the majority, relying on *Glynn County Bd. of Ed. v. Lane*, 261 Ga. 544, 545-546 (1) (407 SE2d 754) (1991), says that requiring the members of the Society to exhaust these administrative remedies would be futile because the Department already has prejudged its authority to sanction the members for failing to answer the survey. I disagree. *Lane* stands for the proposition that, when the available administrative remedy consists of a hearing before a particular judicial decision maker, but the judicial decision maker already has prejudged the issue, it would be futile to require the aggrieved person to exhaust his remedy. See 261 Ga. at 545-546 (1).[8] "Exhaustion of administrative remedies is futile only where further administrative review would result in a decision on the same issue by the same body." *Little v. City of Lawrenceville*, 272 Ga. 340, 342 (3) (528 SE2d 515) (2000) (citation and punctuation omitted).

Here, the administrative remedies available to members of the Society are a hearing before an ALJ and an appeal to the Commissioner. Although some of the Department staff may have prejudged the issue and determined that the Department can sanction members of the Society for failing to complete the questionnaire, nothing

---

[7] The Society points us to *Thomas v. Georgia Bd. of Dentistry*, 197 Ga. App. 589 (398 SE2d 730) (1990), and *Moss v. Central State Hosp.*, 255 Ga. 403 (339 SE2d 226) (1986), on the question of adequacy. I think those cases are distinguishable. In *Thomas*, we concluded that administrative remedies were inadequate because awaiting an administrative remedy would expose the aggrieved person to a risk of criminal prosecution or the revocation of his license to practice dentistry, which would result in a loss of his livelihood. See 197 Ga. App. at 590 (1). And in *Moss*, our Supreme Court concluded that administrative remedies were inadequate because they would expose the aggrieved person to the loss of her job and, thus, a complete loss of her livelihood. See 255 Ga. at 404. Here, as I have already noted, no risk of criminal prosecution is relevant to our assessment of the adequacy of the administrative remedies. See note 6, supra. And the record does not show that even a revocation of an exemption from certificate of need requirements would likely result in a complete loss of livelihood for the members of the Society. I am not convinced that the administrative remedies are inadequate.

To the extent that the Society might be capable of making a showing of inadequacy if this case were remanded, I note that the Society does not ask us to remand this case or suggest that the record on the adequacy of administrative remedies is incomplete. Because the Society does not ask, I would not remand.

[8] In *Lane*, the Supreme Court found that appealing a decision of a board of education to the same board of education would be futile. 261 Ga. at 546 (1).

in the record suggests that the ALJ who might be assigned to hear the matter or the Commissioner personally has prejudged the issue.[9] In the absence of evidence of predisposition,[10] I cannot say that exhaustion of administrative remedies would be futile.

We should view with grave concern the interference with the executive branch that would follow if courts, including this Court on appeal, exercised jurisdiction to make decisions that are committed by law in the first instance to the jurisdiction of administrative bodies. See *George v. Dept. of Natural Resources*, 250 Ga. 491, 492 (299 SE2d 556) (1983). And we should defer to an agency in matters involving the interpretation of the statutes that it is authorized to enforce. See *Albany Surgical v. Dept. of Community Health*, 257 Ga. App. 636, 638 (1) (a) (572 SE2d 638) (2002). Because the members of the Society have available administrative remedies that they failed to exhaust, and because the Society has failed to show that these remedies are inadequate or that their exhaustion would be futile, we must, I think, dismiss this appeal. Because the majority does not, I dissent.

I am authorized to state that Judge Andrews and Judge Dillard join in this dissent.

DECIDED MARCH 30, 2011 — 

*McGuire Woods, Victor L. Moldovan, Kevin C. Watters*, for appellant.

*Thurbert E. Baker, Attorney General, Sidney R. Barrett, Jr.,*

---

[9] The majority says that, because the Society sued both the Department and, in an official capacity only, the Commissioner, the briefs filed in this case by the Department necessarily reflect the views of the Commissioner personally, demonstrating that the Commissioner has prejudged the issue. I am not convinced that the requirement of exhaustion is so easily circumvented and that an aggrieved person can manufacture futility simply by naming the judicial decision makers for the agency as additional parties in a lawsuit. No party to this case has urged that the filing of papers in response to litigation is evidence of futility, and the majority cites no authority for its novel theory. Exhaustion, like other jurisdictional issues, must be assessed as of the time a lawsuit is filed. Consequently, developments occurring after the initiation of litigation cannot breathe life into a lawsuit of which the courts had no jurisdiction when it was filed. See *McNeil v. United States*, 508 U. S. 106, 112 (113 SC 1980, 124 LE2d 21) (1993); see also *Busch v. Jones*, 184 U. S. 598, 599 (22 SC 511, 46 LE 707) (1902). And I note in passing that, even if we were to assess exhaustion as of today, and not as of the time the complaint in this case was filed, the Commissioner on whose watch the briefs in this case were filed no longer occupies the office, and nothing suggests that the new Commissioner, who took office after all briefs in this case were filed, has taken any position on the issue.

[10] Again, the Society does not ask us to remand or suggest that the record is not sufficiently developed to permit a decision on the question of futility. Because it does not ask, I would not remand.

44

*Senior Assistant Attorney General, Alex F. Sponseller, Assistant Attorney General*, for appellees.